[No. B208654. Second Dist., Div. Two. Mar. 23, 2010.]

AMERIGRAPHICS, INC., Plaintiff and Respondent, v.
MERCURY CASUALTY COMPANY, Defendant and Appellant.

1542

COUNSEL

Horvitz & Levy, Lisa Perrochet, Andrea M. Gauthier; Hager & Dowling, Thomas J. Dowling and Holly C. Blackwell for Defendant and Appellant.

Osborne and Associates, William J. Osborne; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiff and Respondent.

## OPINION

**DOI TODD, J.**—In this insurance bad faith case, respondent Amerigraphics, Inc. (Amerigraphics), sued its insurer, appellant Mercury Casualty Company (Mercury), after Amerigraphics's business premises were flooded, and Mercury denied full coverage under the policy. There are two primary issues on appeal.

First, what is the meaning of the "Business Income" coverage in the policy which states that Mercury will pay an insured during its period of suspended business operation the "(i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred . . . ; and [¶] (ii) Continuing normal operating expenses incurred, including payroll"? We agree with the trial court that under the plain meaning of this policy, an insured is entitled to be paid under both subparts without having to offset the two amounts in the event operating expenses exceed net income.

Second, we consider whether an award of punitive damages that is 10 times the amount of compensatory damages and prejudgment interest was correctly calculated and comports with due process. We are satisfied that substantial evidence supports an award of punitive damages, that the amount of compensatory damages should not include prejudgment interest, and that under the circumstances of this case the amount of punitive damages should not exceed compensatory damages by more than a 3.8-to-one ratio.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Insured, the Loss, and the Policy*

Amerigraphics is a printing and graphics design company. It was founded in 1997 as a close corporation by Mark Volper and Boris and Marina Smordinsky. The company leased the first floor of an office building on Ventura Boulevard in Sherman Oaks, California. Before moving in, Volper and the Smordinskys made several tenant improvements, including repairing doors and windows, upgrading the electrical and plumbing systems, and installing modern electrical fixtures, tiles and a new ceiling, at a total cost of about $53,000. After moving in, they made additional tenant improvements between 2001 and 2002 totaling $20,133. The company did well financially

from 1997 to 2000, but business fell off sharply after the September 11, 2001 attacks, and 2002 was a particularly "bad" year.

On Monday, April 14, 2003, Volper discovered that the company's premises were completely flooded. Water was cascading from the ceiling and leaking down the walls, leaving two inches of standing water. Volper and the landlord discovered that the source of the water was a broken water heater in a second-floor restroom. The water damaged all of Amerigraphics's electrical equipment, including a printer that Amerigraphics had purchased for $11,995, and a scanner that had cost $5,176.

Volper called RM Consulting, the company that had sold and serviced the equipment, to evaluate the damage. RM Consulting spent four hours working on the printer and scanner, and determined that both pieces of equipment had been irreparably water damaged.

Amerigraphics was insured under a "California Special Multi-Peril Policy" issued by Mercury in 1999 that covered damage to business personal property, which includes property used in the business and tenant improvements, and loss of business income due to business suspension. The policy had been renewed for a three-year term from October 9, 2002, to October 9, 2005, and the annual premium was $1,516. The business-interruption coverage, titled "Business Income," provides in relevant part: "We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.' . . . [¶] . . . [¶] We will only pay for loss of Business Income that you sustain during the 'period of restoration' and that occurs within 12 consecutive months after the date of direct physical loss or damage. . . . [¶] Business Income means the: [¶] (i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred . . . ; and [¶] (ii) Continuing normal operating expenses incurred, including payroll."

After learning that his insurance broker had failed to immediately report the loss, Volper telephoned Mercury on Friday, April 18, 2003, and reported the loss himself. Mercury assigned the claim to adjuster Ken Brown, who called Volper the following week. Brown admitted at trial that he never discussed the available coverages under the policy with Volper, nor did he fill out Mercury's "coverage checklist" that required the adjuster to discuss the various coverages and to check off the coverages discussed and the date of the conversation.

Because the water damage had created mold and revealed asbestos, Amerigraphics was forced to find a temporary location until the remediation was completed. Volper was unable to find any property on Ventura Boulevard available on a short-term lease, but he did find space on the second floor in a building in Hollywood. Amerigraphics relocated on May 20, 2003, and Mercury paid the relocation expenses and the rent for the new premises. The same month, Volper provided Mercury with a preliminary loss evaluation listing items of business personal property worth approximately $43,000. Mercury paid $10,000 toward the business property loss.

*The Investigation Relating to the Printer and Scanner*

Because adjuster Brown was located in Mercury's San Diego office, Mercury hired an independent local adjusting company, Cunningham Lindsey (C-L), to investigate the claim. Volper gave C-L the report from RM Consulting stating that the printer and scanner had been irreparably damaged. C-L recommended an examination by an equipment refurbishing company. Under the policy, Mercury had the option of repairing or replacing damaged equipment. Brown's supervisor, Chris Boedecker, did not consult RM Consulting and decided that it would be "worthwhile" for Mercury to get a second opinion on the condition of the printer and scanner.

On May 20, 2003, 38 days after the loss, Mercury had a salvage company remove all the damaged equipment from Amerigraphics's premises, including the printer and scanner. The printer and scanner were then sent to Hi Tech Restoration (Hi Tech), a company which locates vendors to evaluate and repair equipment.

On June 10, 2003, Hi Tech arranged for another company, Advanced Data Products, to evaluate the printer. The report from Advanced Data Products erroneously stated that the printer had been in a fire, that its technician had installed a part provided by "the customer" (though Amerigraphics had not provided any parts), and that the technician tested the unit and found it to be "okay." Hi Tech itself tested the scanner and reported on June 10, 2003, that an "O.K. Function light test" was performed, and that the unit needed software to be tested. Amerigraphics had no software that could be used to test the scanner. Hi Tech later admitted that it was unable to perform a "complete functional test of the scanner."

Although the tests were performed in June 2003, Mercury did not advise Volper of the results until September 2003, when it provided him with the reports. At that time, Mercury took the position that the equipment had been restored to its preloss condition, and requested that Volper retake the equipment. Volper found the reports to be unprofessional and inaccurate, and

refused to accept the equipment until Mercury could provide samples created on the machines demonstrating that they functioned properly. Volper later received unidentified copies of black-and-white images that were claimed to have been made on the scanner. Volper called Mercury and complained to Boedecker that "there is nothing here which indicates who, when, on which equipment" the samples were made. Boedecker agreed that this information was necessary, but Mercury was unable to obtain the information.

Ultimately, at Volper's urging, Mercury had the equipment reexamined in June 2004, more than a year after the loss. The testing report on the scanner stated that "we find the unit unable to calibrate and come to the ready state. An internal inspection and diagnostic test revealed that both the Mainboard and connecting CCD boards are defective." The report indicated that repairs would cost about $434. The printer was also found not to print properly, and its magenta ink system was not working and had to be replaced, which would cost $156.

*The "Business Income" Claim*

In August 2003, frustrated and concerned that he had not heard from Mercury about the status of the machines, Volper called his insurance broker, who advised him that the policy might provide coverage for Amerigraphics's "normal operating expenses" during the period the business's operations had been interrupted. Volper called Brown and told him he wanted to make a claim for normal operating expenses. Brown responded that there was no such coverage. Volper then sent Brown a letter enclosing a copy of the relevant policy page with the relevant provision circled. Brown then requested that Volper provide him with a list of the normal operating expenses Amerigraphics had incurred.

On September 17, 2003, Volper sent Brown a list of $59,467.16 in expenses incurred between April 10 and September 12, 2003. Volper's enclosure letter stated that he could provide copies of checks to document each item he had listed, and ended with the plea: "Please, review this part of the claim as soon as possible, because we need the funds just to stay alive." Volper got no response for several months.

In January 2004, Mercury hired a forensic accounting firm to investigate the loss of income claim, but did not notify Volper that it had done so until late March or April. At the end of April, Volper spoke with the accountant, who requested certain information about Amerigraphics, including two years of monthly sales records, one year of operating expenses, and an income tax statement for 2002. It took Volper several weeks to gather the information, which he provided to the accountant by late May 2004.

By letter dated September 15, 2004, Mercury informed Amerigraphics that it was denying the loss of business income claim. Mercury explained its decision as follows: "[The accountant] determined that you incurred a $0 loss in business. Projected expenses of $311,842.40 exceeded projected income of $154,932.65 resulting in a projected loss of $156,909.75. Actual expenses of $76,636.62 exceeded the actual income of $29,259.94, resulting in an operating loss of $47,376.68. During the loss period you had an actual operating loss of only $47,376.68, compared to a projected operating loss of $159,909.75. These results indicate that you did not sustain additional operating losses during the loss period and therefore did not sustain a business income loss."

### The Tenant-improvements Claim

In June 2004, out of frustration with Mercury's handling of the claim, Volper once again called his broker. The broker suggested that Amerigraphics might have a claim for damage to the tenant improvements it had made. Although Boedecker, the Mercury claim supervisor, had identified tenant improvements as an issue to be addressed, Brown never pointed out the coverage provision to Volper, and did not instruct C-L to investigate tenant improvements. By this time, Brown had been replaced on the file by adjuster Rome Oliver. Volper called Oliver to make a claim for tenant-improvement losses, and Oliver immediately told Volper there was no such coverage.

Once again, Volper sent Oliver a copy of the relevant policy page, with the tenant-improvements provision circled. In response to Oliver's subsequent request, Volper sent a letter on June 14, 2004, identifying the $73,000 in tenant improvements Amerigraphics had made. Mercury replied on August 16, 2004, denying the claim for tenant improvements, stating: "Our investigation revealed no damage to the Tenant Improvements as a result of this covered water loss. Since there was not any physical damage to the tenant improvements, your claim for these items is not covered."

After the denial letter had been sent, Mercury instructed C-L to reopen its file on the case, which had been closed for about eight months, and to inspect the premises to determine whether there had been any damage to Amerigraphics's tenant improvements. Between September and December 2004, C-L sent Oliver four supplemental reports, explaining that it was trying to find out from the landlord's insurer, State Farm, whether it had paid the landlord for tenant improvements and that State Farm was not cooperating. C-L's second supplemental report identified an estimated loss by Amerigraphics of $45,000, which C-L calculated by taking the $73,000 figure submitted by Volper and prorating it over the life of the lease.

On December 14, 2004, Volper wrote to Oliver complaining about the delay in paying the claim and asked for $23,000, which he said "we dearly need to survive." Then "out of absolute desperation," Volper sent two or three letters to Mercury's president, asking him to intervene to get the claim paid. At least one of Volper's letters to Mercury's president was routed to Mercury's senior vice-president in charge of claims, who in turn routed it to Boedecker's supervisor, but she never followed up to see how the claim was handled.

In February 2005, Mercury decided to give Amerigraphics the "benefit of the doubt," and on February 3, 2005 (693 days after the loss), sent Amerigraphics $23,000 as "payment in full" for its tenant-improvements claim.

## The Litigation

In April 2005, Amerigraphics sued Mercury for breach of contract and bad faith. Prior to trial, Amerigraphics sought a judicial interpretation of the policy's "Business Income" provision, known more commonly in the industry as a business-interruption clause. The trial court held multiple hearings on this issue following multiple rounds of briefing. The court ultimately concluded that the plain language of the policy provided coverage for *both* elements stated in the definition, i.e., an insured was entitled to recover both net income and continuing normal operating expenses without having to offset one against the other.

The case then proceeded to the first phase of trial before the jury on the issue of liability. Volper testified that by September 2003, he and the Smordinskys were borrowing money to keep Amerigraphics afloat. By June 2004, the company was completely out of money. Volper testified that if Mercury had provided a working scanner and printer and had paid the company's claims by November 2003, he believed he could have kept the business going, and that although Amerigraphics continued to pay the fees necessary to maintain its right to do business, it no longer functions as a going concern.

Boedecker conceded that a company in the printing and scanning business, like Amerigraphics, could not function without a printer and scanner. He also admitted that Mercury made no attempt to provide Amerigraphics with a replacement printer and scanner while Mercury was adjusting the claim. And he conceded that nothing in the claim file, which was approximately 1,000 pages long, reflected any concern that Amerigraphics would go out of business due to the delays in handling the claim. Boedecker also confirmed that he communicated by e-mail with his unit, that e-mail pertaining to a particular claim was required to be kept in the file, and that six to seven

people within Mercury worked on the claim, as well as eight outside entities. Yet when Mercury produced the claim file, it contained only two e-mails.

After the presentation of evidence by both sides, including expert witness testimony, Mercury moved for nonsuit on the issue of punitive damages, arguing that there was insufficient evidence of malice, fraud or oppression. The court denied the motion and stated that there was more than enough evidence for the issue to go to the jury. The parties agreed that Amerigraphics's claim for attorney fees as tort damages under *Brandt v. Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796] (*Brandt*) would be decided by the court in a posttrial motion. The parties also agreed on the form of the special verdict to be presented to the jury, which consisted of four questions. The jury responded to those questions as follows:

"We, the jury, answer the questions submitted to us as follows:

"1. Did Mercury Casualty Company breach its contract of insurance with Amerigraphics?

" X  Yes ___ No

"*If your answer to question 1 is 'yes,' then answer question 2. . . .*

"2. What damages did Amerigraphics sustain?

"Printer/Scanner/Normal Operating Expenses/Tenant Improvements

"$130,000.[1]

"*If your answer to question 2 is in the affirmative, then answer question 3. . . .*

"3. Did Mercury Casualty Company breach the obligation of good faith and fair dealing by unreasonably failing to pay OR unreasonably delaying payment of insurance benefits OR failing to properly investigate the loss?

" X  Yes ___ No

"*If your answer to question 3 is 'yes,' then answer question 4. . . .*

---

[1] The parties presume that the damage amount of $130,000 found by the jury was based on Volper's testimony that Amerigraphics was still owed $17,000 for the printer and scanner, $22,000 in tenant improvements, and $91,000 in normal operating expenses.

"4. Has Amerigraphics proved by clear and convincing evidence that an agent or employee of Mercury Casualty Company engaged in the conduct with malice, fraud, or oppression?

" X  Yes ___ No."

For the second phase of trial to determine the amount of punitive damages, the only additional evidence was the parties' stipulation that Mercury's net worth was $679 million. The jury awarded Amerigraphics $3 million in punitive damages, plus $40,000 in prejudgment interest at 7 percent from February 1, 2004.

Mercury moved for a partial judgment notwithstanding the verdict (JNOV), asking the trial court to strike the punitive damages and the prejudgment interest awards. Mercury also moved for a new trial on the punitive damages award, arguing, among other things, that the amount of punitive damages was grossly excessive. The trial court denied the JNOV motion, but conditionally granted the new trial motion unless Amerigraphics consented to a remittitur of the punitive damages award from $3 million to $1.7 million. The court concluded that the compensatory damages of $130,000 awarded by the jury were the same damages for both breach of contract and bad faith, and that together with the $40,000 prejudgment interest award, totaled $170,000 in compensatory damages. The court believed that the punitive damages award should be reduced to 10 times the compensatory damages. In concluding that the evidence supported an award of punitive damages of $1.7 million, the court repeatedly stated that the handling of the claim was "really terrible," "really, really bad," "a disaster," "total disaster," and that this "was a very, very, very solid case for punitive damages, as solid as I have ever seen in my time on the bench."

Amerigraphics's motion for an award of *Brandt* fees was heard after the new trial motion. The court awarded Amerigraphics attorney fees of $346,541.25, plus costs of $31,490.97. Amerigraphics accepted the remittitur of the punitive damages award, and judgment was entered against Mercury based on the reduced award, the compensatory damages, the prejudgment interest, and the court's award of fees and costs. This appeal followed.

## DISCUSSION

### I.  *The "Business Income" Provision*

#### A.  *Standard of Review and Contract Interpretation*

■  The interpretation of an insurance contract is an issue of law, which is reviewed de novo under well-settled rules of contract law. (*E.M.M.I. Inc. v.*

*Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470 [9 Cal.Rptr.3d 701, 84 P.3d 385].) The fundamental rule of contract interpretation is that a contract should be construed to give effect to the mutual intention of the contracting parties at the time the contract was formed. (Civ. Code, § 1636; *Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 [90 Cal.Rptr.2d 647, 988 P.2d 568].) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (Civ. Code, § 1639.) " ' "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' ([Civ. Code], § 1644), controls judicial interpretation. ([Civ. Code], § 1638.)" ' " (*E.M.M.I., supra,* at p. 470.)

■   A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648 [3 Cal.Rptr.3d 228, 73 P.3d 1205].) If there is ambiguity, it is resolved by interpreting the ambiguous provisions in the sense the insurer believed the insured understood them when the contract was made. (*Jordan v. Allstate Ins. Co.* (2004) 116 Cal.App.4th 1206, 1213 [11 Cal.Rptr.3d 169].) This means the court must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. (*Ibid.*) In doing so, the court must interpret the language in the context of the policy as a whole, and in the circumstances of the case. (*Ibid.; Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) If the ambiguity cannot be resolved, it is construed against the party who caused it to exist. (*Jordan v. Allstate Ins. Co., supra,* at p. 1213.) In an insurance policy, coverage provisions are interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted narrowly. (*MacKinnon v. Truck Ins. Exchange, supra,* at p. 648.)

B.   *The Trial Court Properly Interpreted the "Business Income" Provision*

Amerigraphics argues that the language used in the business-income provision is clear, based on the meaning of the word "and" used between subparts (i) and (ii) in the definition of "Business Income." As Amerigraphics points out, the word "and," used in its ordinary and popular sense, is a conjunction used to indicate "an additional thing, situation, or fact." (Citing to encarta Dict. of the English Language, www.encarta.com.) Thus, under the plain language of the policy, the business-income provision should be interpreted to mean that Mercury will pay an insured for any lost income *and* will pay an insured its continuing normal business expenses during the period of business suspension. To the extent there is no lost income (i.e., there is only a net loss), the amount paid under subpart (i) would be zero, but the insured would still be paid under subpart (ii) for its operating expenses.

Mercury, on the other hand, argues that the use of the word "and" means that subparts (i) and (ii) must be read together, rather than as two distinct components, and that "and" is the equivalent of the mathematical operator "plus." Under Mercury's interpretation, if the insured's net income during the period before the covered loss is a net loss (i.e., a negative number) that is greater than its operating expenses, the insured will be paid nothing under the provision. Only if the insured's net income is a positive number will it be added to the operating costs so that the insured will be paid under both subparts. But the policy does not use the words "plus," "offset," "subtract," "minus," or the like. It uses the word "and." The plain meaning of "and" is consistent with Amerigraphics's and the trial court's interpretation.

We are not persuaded by the two out-of-state cases on which Mercury relies to support its position. Mercury cites to *Continental Ins. Co. v. DNE Corp.* (Tenn. 1992) 834 S.W.2d 930, decided under Tennessee law, and *Dictiomatic, Inc. v. U.S. Fid. & Guar. Co.* (S.D.Fla. 1997) 958 F.Supp. 594. In those cases, the courts construed the identical business-income provision at issue here in the same manner as Mercury.[2] The courts concluded that any other interpretation would put the insured in a better position than it would have been without the business interruption in any case where there is a net loss, because the insured would still be paid its operating expenses, rather than having to suffer that loss. As the cases noted, the purpose of business-interruption insurance is to protect the insured against losses that occur when its operations are unexpectedly interrupted, and to place it in the same position it would have occupied if the interruption had not occurred.

■ The *Continental* court thus concluded that "the amount of 'business income' under the insurance policy provision involved in this case should be determined by adding the amount of 'net income' and the amount of 'continuing normal operating expenses.' Under this approach, if 'net income' is a positive number (which will occur whenever there are net profits), the amount of 'business income' will be the sum of two positive numbers, and the insured will be entitled to recover that amount. If, however, 'net income' is a negative number (which will occur whenever there is a net loss), the amount of 'business income' will be the amount of 'continuing normal operating expenses' reduced by the amount of the net loss. If, as under the facts of this case, the amount of the net loss that would have been incurred had there been no business interruption *exceeds* the amount of normal operating expenses actually incurred, the resulting number is a negative number, and there can be no recovery for an 'actual loss of business income.' " (*Continental Insurance Co. v. DNE Corp., supra,* 834 S.W.2d at

---

[2] Mercury never cited these cases to the trial court, despite the court's continuance of a hearing on the matter so that Mercury could conduct more thorough research on the interpretation of the policy language.

p. 934.) We disagree with the *Continental* court that this conclusion is "obvious . . . from the wording of the policy." (*Id.* at p. 932.) In any event, we are not bound by out-of-state authorities. (*In re Establishment of Eureka Reporter* (2008) 165 Cal.App.4th 891, 899 [81 Cal.Rptr.3d 497].)

Mercury also argues that the trial court's interpretation reads the "Net Loss" language out of the policy's definition of "Business Income" because the insurer would owe no benefits under subpart (i) if the business had been operating at a loss prior to its suspension. Here, again, we disagree. The trial court's construction of the coverage does not render the term "Net Loss" superfluous. Rather, in the event that there is a net loss, the insured's entitlement to benefits for loss of "net income" is zero. Construing the two subparts as operating independently is far more consistent with the plain meaning of the policy language than Mercury's suggested definition.

Even if we assumed Mercury's interpretation of the policy language is reasonable, we would have to conclude that an ambiguity exists. We resolve an ambiguity by interpreting the ambiguous provision in the sense the insurer believed the insured understood it when the contract was made (i.e., we must determine whether coverage is consistent with the insured's objectively reasonable expectations). (*Jordan v. Allstate Ins. Co., supra,* 116 Cal.App.4th at p. 1213.)

As Amerigraphics points out, if a catastrophic event damages an insured's business premises and prevents the insured from being able to operate, any business in that situation would face two distinct problems: (1) a loss of money coming into the business (loss of income), *and* (2) payment of ongoing fixed expenses, even though no money is coming in. A reasonable insured would see that the definition of "Business Income" has two distinct components: (i) net income, and (ii) continuing normal expenses. Because the definition provides that "Business Income" includes both items, a reasonable insured relying on the plain language of the clause would reasonably conclude that the policy covers both items. Indeed, we note that the "Business Income" provision appears in the policy under the preceding heading of "Additional Coverages." Given its placement in the policy and the plain language of the provision, it would be objectively reasonable for an insured purchasing the policy to construe it as protecting both its lost income stream and as defraying the costs of ongoing expenses until operations were restored.

Under both parties' interpretation, an insured business will be paid if the business was operating at a profit prior to the covered loss. It is only when a business was operating at a net loss greater than its operating costs that it would not be paid at all under Mercury's interpretation. But there is nothing in the policy language to suggest to an insured that if a business is not

earning a profit it should not expect coverage for its continuing expenses during the period it cannot operate. It is not unusual for business income to fluctuate from year to year. A business should not have to be concerned that if it does poorly for one or two years and a covered catastrophic loss occurs during that timeframe, then the business will not be paid anything under the "Business Income" provision. In essence, Mercury's interpretation relies on the implied assumption that only a profitable business would be protected by the provision. A business that is just starting out may operate at a temporary loss until it becomes established and secures a customer base. If that business knew that there would be no coverage under the "Business Income" provision of the policy for ongoing expenses if it suffered a catastrophic loss under the policy, there would be no point for that business to purchase the additional coverage.

As drafted, the plain meaning of the language in this Mercury policy would lead an ordinary insured to conclude that, in the event of a covered loss that forced the complete suspension of its business operations, the policy would provide coverage for any lost profits, and even if there were no lost profits, for ongoing expenses incurred during the period of suspension. We are satisfied that the trial court correctly construed the policy.

## C. *Error in Exclusion of Expert Evidence Was Harmless*

Mercury next argues that even if the trial court's policy interpretation was correct, the court erred in excluding evidence from Mercury's claims handling expert that Mercury's interpretation was reasonable.

At trial, Mercury asked its expert witness if she was able to figure out why Mercury had not paid Amerigraphics any money under the "Business Income" provision of the policy. After she answered "yes," Amerigraphics's attorney objected and a lengthy sidebar ensued. Mercury's offer of proof was that its expert would testify that Mercury's interpretation of the provision was a reasonable one that she had used many times and that had been utilized many times in the industry. The trial court ultimately excluded the testimony, finding that "[t]here was nothing in the papers about custom and practice in the industry," that Amerigraphics's expert had already testified based on the court's interpretation of the policy provision, and that "we're not going to do sua sponte reconsideration or a motion for reconsideration in the middle of the trial."

Contrary to the trial court's recollection, Mercury's expert witness declaration had stated that Mercury's expert would testify as to whether Mercury's actions "were consistent with standards in the insurance industry and as that conduct relates to the bilateral duties of good faith and fair dealing."

Although this description did not specifically mention custom and practice in the industry regarding interpretation of the particular business-income provision at issue here, it did provide sufficient notice that Mercury's expert would testify about industry standards relating to the issue of bad faith. (See *Bonds v. Roy* (1999) 20 Cal.4th 140, 146, 149 [83 Cal.Rptr.2d 289, 973 P.2d 66] [statutory discovery scheme requires parties to give "fair notice of what an expert will say at trial" by providing " '[a] brief narrative statement of the general substance of the testimony that the expert is expected to give' "].) Thus, the trial court's exclusion of the testimony on the basis that custom and practice in the industry were not previously mentioned was incorrect.

■ Mercury argues that the testimony should have been admitted because it was relevant to the issue of bad faith. As Mercury points out, "an insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 723 [68 Cal.Rptr.3d 746, 171 P.3d 1082].) Mercury argues that its expert's proffered testimony was relevant to counter Amerigraphics's argument that Mercury had acted unreasonably (i.e., in bad faith) in denying payment under the business-income provision. We agree that the testimony was relevant to the issue of bad faith, because it would have provided evidence that Mercury's incorrect interpretation of the business-income provision was at least reasonable under industry standards.

Amerigraphics, on the other hand, argues that custom and usage are admissible only as instruments of interpretation and not to vary the express terms of a contract (*C. J. Wood, Inc. v. Sequoia Union High School Dist.* (1962) 199 Cal.App.2d 433, 436 [18 Cal.Rptr. 647]), and that "Mercury's proffered testimony would have been an improper back-door attempt to circumvent the court's ruling on the proper construction of the policy." But Mercury's expert was not going to testify that the trial court's contractual interpretation was wrong, only that the provision had been interpreted differently in the insurance industry, for the purpose of assisting the jury in determining whether Mercury's conduct in denying payment under the business-income provision was reasonable.

To the extent there was any legitimate concern that the jury might be confused into thinking that Mercury's expert knew more than the trial judge, that concern could have been remedied with a cautionary instruction that the expert's testimony was being admitted solely on the issue of the reasonableness of Mercury's conduct, not on the correct construction of the policy. (See *Higgins v. L. A. Gas & Electric Co.* (1911) 159 Cal. 651, 660 [115 P. 313] [new trial proper when court failed to give limiting instructions regarding jury's examination of exhibit]; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 913 [93 Cal.Rptr.2d 364]

[court did not abuse its discretion "in ordering a consolidated trial before the same jury with an appropriate cautionary instruction"].) Thus, exclusion of the expert's testimony was error.

But we conclude that the error was harmless. "[T]rial error is usually deemed harmless in California unless there is a 'reasonabl[e] probab[ility]' that it affected the verdict." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 [34 Cal.Rptr.2d 898, 882 P.2d 894], quoting *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Mercury asserts that both testimony and arguments at trial placed great emphasis on Mercury's decision to investigate lost profits and to deny benefits under the business-income provision. Mercury argues that testimony from its expert that other insurers interpreted the business-income provision the same way Mercury did would have been compelling evidence that Mercury's interpretation was at least reasonable. Mercury also argues that had the jury been allowed to hear such evidence, there is more than a reasonable chance the jury would have returned a more favorable verdict on bad faith, punitive damages, or prejudgment interest.

But Mercury's argument ignores that Amerigraphics's bad faith claim was not limited to the denial of payment under the business-income provision. The jury was instructed that it could find Mercury liable for bad faith if it found that Mercury unreasonably failed to pay *or* unreasonably delayed payment *or* failed to properly investigate the loss. Here, the evidence supported a finding under all three factors. While Mercury's expert testified that Mercury did nothing wrong in the way it handled the claim—that its investigation was fair, balanced, and prompt; that there were no regulatory violations; and that Mercury's adjustment of the claim was, in all respects, reasonable—Amerigraphics's expert testified to the contrary. He testified that Mercury did violate California's regulatory standards. He also testified that Mercury's entire handling of the claim was unreasonable: Mercury never advised Amerigraphics about potential available coverage; Mercury failed to investigate promptly once a claim was made; Mercury twice told Amerigraphics that there was no coverage without even checking the policy provisions; and Mercury failed to provide an explanation or refer to the relevant policy provisions when denying a claim. Amerigraphics's expert also pointed out that there was no indication in the claim file that Mercury had any concern about the impact on Amerigraphics of being without its printer and scanner, and Mercury's failure to provide Amerigraphics with a printer and scanner essentially put Amerigraphics out of business. Amerigraphics's expert was critical of the fact that Mercury delayed payment of the tenant-improvements claim for months while it waited for State Farm to provide information, and then paid only $23,000 on that claim even though

Amerigraphics had provided documentation that its loss exceeded $73,000. He was also critical of the one-year delay in processing the claim for business-income coverage.

In light of the testimony by Amerigraphics's expert and the other evidence presented at trial, there was substantial evidence on which the jury could base findings that not only did Mercury engage in bad faith, it did so with malice, fraud or oppression. Indeed, the vote on each question was 12 to zero. It is simply not reasonably probable that had Mercury's expert been permitted to testify that Mercury's conduct was reasonable with respect to its interpretation of the business-income provision, which was merely *one* part of the overall claim for coverage, that the jury would have reached a different verdict on the bad faith, punitive damages, and prejudgment interest claims.

## II. *Punitive Damages*

### A. *Special Verdict Findings*

Mercury contends that the punitive damages should be stricken from the judgment because they were not supported by the findings on the special verdict. It argues that because the jury did not separately award damages for bad faith, there was no predicate for an award of punitive damages.

As an initial matter, we reject Amerigraphics's claim that Mercury has waived this argument by not objecting below to the special verdict form. It was not Mercury's responsibility to obtain special verdict findings on Amerigraphics's tort cause of action. Rather, the party attempting to enforce the judgment based on the special verdict must bear the responsibility for a special verdict submitted to the jury on its own case. (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 961–962 [17 Cal.Rptr.2d 242].) In any event, Mercury preserved the issue by raising it in its JNOV motion. (*All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1220 [228 Cal.Rptr. 736].)

■ Mercury is correct that the jury made no separate factual finding on the special verdict form as to the amount of compensatory damages for the bad faith cause of action, and that actual damages, even nominal damages, are an absolute predicate for an award of punitive damages. (*Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 147 [279 Cal.Rptr. 318, 806 P.2d 1353].) Mercury is also correct that we do not imply findings on all issues in favor of the prevailing party with a special verdict, as we do with a general verdict. (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 285 [73 Cal.Rptr.2d 596].) But the special verdict form here did not *preclude* a finding of punitive damages.

The jury was instructed on the elements that had to be proven to establish bad faith. These included the instruction that in order for Amerigraphics to establish that Mercury had breached the implied covenant of good faith and fair dealing, Amerigraphics had to prove that it was harmed by Mercury's bad faith conduct. The jury's finding that Mercury breached its obligation of good faith and fair dealing to Amerigraphics therefore necessarily included the finding that Amerigraphics had been damaged by Mercury's conduct.

With respect to the amount of damages suffered by Amerigraphics as a result of Mercury's bad faith, Amerigraphics's attorney repeatedly argued to the jury that the same evidence that supported a finding of breach of contract also supported a finding of bad faith. He then set forth the testimony given at trial as to the amount of Amerigraphics's damages, which included the printer, scanner, normal operating expenses, and tenant improvements, which totaled $130,000—the amount ultimately awarded by the jury in response to question No. 2 on the special verdict form. Mercury's attorney, in his own closing argument, never disputed that the amount of damages caused by any bad faith conduct was the same as those caused by the breach of contract. Nor did he argue that the bad faith damages could be more or less than the contract damages or any other amount. Indeed, his minimal discussion on bad faith was limited to asking the jury to weigh each expert's testimony.

In sum, on the basis of the evidence offered at trial, the jury instructions, and counsel's closing argument, it is clear that the jury intended to find that Amerigraphics had been harmed by Mercury's bad faith in the same amount that it had been harmed by Mercury's breach of contract. In other words, Amerigraphics suffered damage in the amount of $130,000, which could have been awarded for either breach of contract or bad faith. As such, we find Mercury's argument to be without merit.

### B. *Substantial Evidence*

Mercury next argues that the punitive damages should still be stricken from the judgment because they are not supported by substantial evidence of malice, oppression or fraud.

Civil Code section 3294, subdivision (a) provides: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." The clear and convincing standard "require[s] that the evidence be ' "so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " (*In re Angelia P.* (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198].)

■ The statute defines "malice" as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) "Oppression" means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).) And finally, "fraud" means "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c)(3).)

We have little trouble in this case concluding that there was more than substantial evidence to support an award of punitive damages. The evidence showed that Mercury was intentionally dishonest and showed a conscious disregard of Amerigraphics's rights. Not only did Mercury never advise Amerigraphics about the available coverages, on at least two occasions Mercury immediately told Amerigraphics that there was no coverage (for "business income" and tenant improvements), and only looked into the matter when Volper pressed the issue and pointed out the applicable policy provisions. Mercury expressly denied coverage for the tenant-improvements claim, stating that its investigation showed that none of the tenant improvements made by Amerigraphics had been damaged. In reality no such investigation had been undertaken, and no such investigation even occurred until *after* the denial letter had been sent.

Having denied the tenant-improvements claim based on an investigation that never took place, once it reopened its file on this claim, Mercury allowed the claim to languish for months while it attempted to get information from State Farm as to whether it had paid the landlord for Amerigraphics's tenant improvements. Mercury finally paid on the claim, and then only a fraction of the amount Amerigraphics was seeking, when Volper "out of absolute desperation" wrote multiple letters to Mercury's president "begging" for help.

Mercury's handling of the printer and scanner was similarly despicable. It is undisputed that the printer and scanner were the key pieces of equipment Amerigraphics needed to run its business. By the time Mercury began its investigation of the damage to the printer and scanner, RM Consulting had already evaluated the equipment and found both pieces were beyond repair. Yet, no one at Mercury ever contacted RM Consulting to discuss its findings. Mercury did not have the equipment tested by Hi Tech until nearly 60 days after the loss. Then, Mercury did nothing for another three months, until it falsely informed Volper that the equipment was in preloss condition or better, despite the fact that none of the reports from Hi Tech or

its subvendors supported such a position. Mercury could not produce a single test page produced on either machine to support its finding. And even after Volper pointed out the problems with the information supplied by Hi Tech, Mercury persisted in its view that the equipment had been repaired and that Amerigraphics should take it back. Ultimately, the evaluation of the equipment performed more than a year after the loss showed that it was not working, and confirmed that the equipment had not been repaired. Throughout the two years Amerigraphics's claim was pending, Mercury never offered to provide Amerigraphics with replacement equipment, and, as the trial court aptly noted, effectively put Amerigraphics out of business.

Mercury's investigation of the business-income claim also proceeded at a snail's pace. Although Volper sent Mercury the information it requested to process the claim in September 2003, Mercury never informed Volper until late March or April 2004 that it had hired a forensic accountant to examine his claim. Volper quickly sent a substantial packet of financial information as requested by the accountant. Mercury denied the claim on September 15, 2004, 552 days after the loss.

■ Although Mercury tries to spin the facts as evidencing nothing more than negligence or incompetence, an insurance company can always make that argument when charged with mishandling a claim. As the court explained in *George F. Hillenbrand, Inc. v. Insurance Co. of North America* (2002) 104 Cal.App.4th 784, 816 [128 Cal.Rptr.2d 586]: "Jurors, not appellate justices, hear the evidence and determine the facts. Properly instructed, they are the primary arbiters of acceptable behavior between an insurer and its insured. It is they, with their collective understanding of the limits of what decent citizens ought to have to tolerate, who are charged with assessing the degree of reprehensibility and meting out an appropriate financial disincentive for untoward claims practices. Their authority is not unbridled. However, our role in reviewing the jury's work is a deferential one."

We note that Mercury does not claim that the jury was improperly instructed, and the jury unanimously found that Mercury acted with malice, oppression, or fraud. We are satisfied that the evidence in the record amply supports this finding.[3]

---

[3] Mercury argues that if we find insufficient evidence to support an award of punitive damages or that the trial court erred in construing the "Business Income" provision, then we must reverse the jury's award of prejudgment interest. Because we find no error and that punitive damages are supported by the evidence, there is no basis for reversing the award of prejudgment interest.

### C. *Amount of Punitive Damages*

Mercury argues that the punitive damages should be reversed or reduced as constitutionally excessive. The jury awarded $3 million in punitive damages, which the trial court later reduced to $1.7 million. This amounted to 10 times the total of $130,000 in compensatory damages, plus $40,000 in prejudgment interest.

■ "The due process clause of the Fourteenth Amendment to the United States Constitution places constraints on state court awards of punitive damages." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712 [101 Cal.Rptr.3d 773, 219 P.3d 749] (*Roby*) [citing *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416–418 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*) and *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 568 [134 L.Ed.2d 809, 116 S.Ct. 1589] (*BMW*)].) "The imposition of 'grossly excessive or arbitrary' awards is constitutionally prohibited, for due process entitles a tortfeasor to ' "fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." ' [Citation.]" (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1171 [29 Cal.Rptr.3d 379, 113 P.3d 63] (*Simon*).) A further overarching consideration is that courts presume that " 'a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. [Citation.]' " (*Jet Source Charter, Inc. v. Doherty* (2007) 148 Cal.App.4th 1, 9 [55 Cal.Rptr.3d 176].)

■ In *State Farm*, the high court articulated "three guideposts" for courts reviewing punitive damages: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*State Farm, supra*, 538 U.S. at p. 418; see also *BMW, supra*, 517 U.S. at p. 575.) "In deciding whether an award of punitive damages is constitutionally excessive under *State Farm* and its predecessors, we are to review the award de novo, making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct." (*Simon, supra*, 35 Cal.4th at p. 1172.)

### 1. *Reprehensibility Factors*

"Of the three guideposts that the high court outlined in *State Farm, supra*, 538 U.S. at page 418, the most important is the degree of reprehensibility of the defendant's conduct. On this question, the high court instructed courts to consider whether '[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.' (*Id.* at p. 419.)" (*Roby, supra*, 47 Cal.4th at p. 713; see *Simon, supra*, 35 Cal.4th at p. 1180.) "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." (*State Farm, supra*, 538 U.S. at p. 419.)

Applying these factors here, there is no dispute as to the first two reprehensibility factors articulated by *State Farm*. The harm caused by Mercury was economic and not physical, and there was no showing of a disregard for the health or safety of others.

■■■ Mercury disputes the third factor of Amerigraphics's financial vulnerability, but we find this factor to weigh in favor of a finding of reprehensibility. The evidence showed that Amerigraphics was losing money even before its premises were flooded, that Mercury removed the equipment Amerigraphics needed to keep its business going and never replaced it, and that Volper's letters to Mercury clearly explained that Amerigraphics needed the money to survive. Moreover, the relationship between an insurer and its insured is unique, in that an insured like Amerigraphics purchases insurance precisely to buy peace of mind and security. (See *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819 [169 Cal.Rptr. 691, 620 P.2d 141].) "A fundamental disparity exists between the insured, which performs its basic duty of paying the policy premium at the outset, and the insurer, which, depending on a number of factors, may or may not have to perform its basic duties of defense and indemnification under the policy. (See *Foley* [*v. Interactive Data Corp.* (1988)] 47 Cal.3d [654,] 693 [254 Cal.Rptr. 211, 765 P.2d 373] [noting the 'insurer's and insured's interest are financially at odds'].) An insured is thus not on equal footing with its insurer—the relationship between insured and insurer is inherently unequal, the inequality resting on contractual asymmetry. An insurer's tort liability for breach of the covenant is thus predicated upon special policy factors inapplicable to the insured. [Citation.]" (*Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 404–405 [97 Cal.Rptr.2d 151, 2 P.3d 1].)

Regarding the fourth reprehensibility factor of whether the conduct involved repeated actions or was an isolated incident, again the parties disagree. Although Mercury's conduct could be characterized as more than a single isolated incident, as the evidence showed several discrete acts of misconduct involving Amerigraphics's claim for coverage under various policy provisions, the conduct at issue ultimately involved only one insured and one claim. There was no evidence presented that Mercury acted similarly toward other insureds in similar circumstances. Thus, on the evidence before us we cannot conclude that Mercury was a "repeat offender." (*Simon*, 35 Cal.4th at p. 1180.)

As to the fifth reprehensibility factor, whether Mercury acted with intentional malice, trickery or deceit, "the jury here necessarily determined that [the defendant] acted with 'conscious disregard' of the rights of others (Civ. Code, § 3294, subd. (c)(1), (2)); therefore, the conduct at issue was certainly not 'mere accident' (*State Farm, supra*, 538 U.S. at p. 419)." (*Roby, supra*, 47 Cal.4th at pp. 715–716.) Nevertheless, the evidence falls short of demonstrating that Mercury's conduct constituted "intentional malice." Although the end result of Mercury's egregious mishandling of the claim was that Amerigraphics went out of business, the evidence does not suggest that Mercury was guided by this goal from the outset.

We therefore conclude that of the five reprehensibility factors, only financial vulnerability weighs in favor of Amerigraphics.

### 2. *Ratio of Punitive Damages to Actual Harm*

In *State Farm*, the court stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*State Farm, supra*, 538 U.S. at p. 425.) "The court also explained that past decisions and statutory penalties approving ratios of 3 or 4 to 1 were 'instructive' as to the due process norm, and that while relatively high ratios could be justified when ' "a particularly egregious act has resulted in only a small amount of economic damages" [citation] . . . [t]he converse is also true . . . . When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.' " (*Simon, supra*, 35 Cal.4th at p. 1182.)

The Supreme Court in *Exxon Shipping Co. v. Baker* (2008) 554 U.S. 471 [171 L.Ed.2d 570, 128 S.Ct. 2605] reviewed studies evaluating the median ratio of punitive to compensatory verdicts, which "put the median ratio for the entire gamut of circumstances at less than 1:1 [citation], meaning that the compensatory award exceeds the punitive award in most cases." (554 U.S. at

p. ___ [128 S.Ct. at p. 2633].) The court noted that it "has long held that '[p]unitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor . . . and to deter him and others from similar extreme conduct.' [Citations.]" (554 U.S. at p. ___, fn. 27 [128 S.Ct. at p. 2633, fn. 27].)

The trial court here relied on *Simon* in reducing the award of punitive damages to a 10-to-one ratio, the same ratio found by the *Simon* court to comport with due process. The plaintiff's claim in *Simon* arose from a failed attempt to purchase an office building from the defendant. Although the jury found the parties never reached a binding contract, the jury did find that the defendant had committed promissory fraud, and awarded compensatory damages of $5,000 and punitive damages of $1.7 million (a 340-to-one ratio). (*Simon, supra*, 35 Cal.4th at p. 1166.) The *Simon* court noted that only one of the five reprehensibility factors weighed in favor of the plaintiff, but relied on *State Farm* for the position that "due process permits a higher ratio between punitive damages and a small compensatory award for purely economic damages containing no punitive element . . . ." (*Simon, supra*, at p. 1189.)

*Roby, supra*, 47 Cal.4th 686, an employment discrimination and harassment case, was issued by our high court subsequent to the trial court's ruling here. There, the jury awarded more than $3 million in compensatory damages and $15 million in punitive damages to the plaintiff, who suffered from panic attacks and whose employer treated her poorly as a consequence. (*Id.* at p. 692.) The high court reduced the compensatory damages award to $1,905,000, noting that of this sum $605,000 was for the plaintiff's economic losses and the remaining $1.3 million was for her "physical and emotional distress and may have reflected the jury's indignation at [the employer's] conduct, thus including a punitive component." (*Id.* at p. 718.) Despite finding that three of the five *State Farm* reprehensibility factors were present, the court nevertheless concluded that the employer had a "relatively low degree of reprehensibility." (*Roby, supra*, at p. 719.) Because the court also found that the compensatory damages award was "substantial" and included a "substantial" award of noneconomic damages, the court concluded that a one-to-one ratio was the federal constitutional limit, and reduced the punitive damages award accordingly. (*Ibid.*) The dissenting and concurring opinion concluded that the conduct was sufficiently reprehensible to permit a two-to-one ratio of punitive damages.

Mercury cites to other California appellate cases indicating that a one-to-one limit is appropriate in most cases, especially those involving purely economic loss. In *Jet Source Charter, Inc. v. Doherty, supra*, 148 Cal.App.4th 1, where the compensatory damages and prejudgment award was $6.5 million and the punitive damages award was $26 million, the appellate court concluded that the punitive damages award should be reduced to the amount of

compensatory damages, noting that the compensatory damages award was "substantial," did not seem to involve a punitive element, and the plaintiff was not vulnerable. Similarly, in *Walker v. Farmers Ins. Exchange* (2007) 153 Cal.App.4th 965 [63 Cal.Rptr.3d 507], the appellate court affirmed a remitted punitive damages judgment against an insurer, which was reduced from $8.3 million to $1.5 million, or a one-to-one ratio. There, an evaluation of the reprehensibility factors showed a relatively low level of reprehensibility on the part of the insurer, given that the insurer's denial of a defense involved only economic harm and emotional distress, the denial was an isolated incident that resulted from a mistake rather than intentional malice or deceit, and the compensatory damages, which were "substantial," included a punitive element. (*Id.* at pp. 973–975.)

Amerigraphics attempts to alter the ratio by arguing that its total compensatory damages was $516,541 (jury verdict plus *Brandt* fees), and therefore as remitted, the punitive damages award is only 3.2 times the compensatory damages award. But contrary to Amerigraphics's argument, the trial court properly excluded the amount of *Brandt* fees in determining the compensatory damages award, since the *Brandt* fees were awarded by the court after the jury had already returned its verdict on the punitive damages. Amerigraphics also claims that prejudgment interest should be included in the ratio calculation. But we are aware of no authority supporting this contention. To the contrary, the court in *Bardis v. Oates* (2004) 119 Cal.App.4th 1, 18–19 [14 Cal.Rptr.3d 89], found that the actual damages as determined by the jury should be used as the base figure for calculating the punitive damages ratio. Finally, Amerigraphics also attempts to alter the ratio by referring to the "potential injury" that was avoided by its actions in vigilantly pursuing its right to coverage under the policy. But an assessment of previously avoided losses may not be considered in assessing the ratio of punitive damages to harm. (*Simon, supra*, 35 Cal.4th at p. 1177.) Only prospective injuries that are foreseeable from the defendant's conduct may be considered. "The potential harm that is properly included in the due process analysis is ' "harm *that is likely to occur from the defendant's conduct*." ' [Citation.]" (*Ibid.*)

### 3. *Comparable Civil Penalties*

We briefly address the third guidepost courts consider when evaluating a punitive damages award, which is the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases. (*Jet Source Charter, Inc. v. Doherty, supra*, 148 Cal.App.4th at p. 8.) In this regard, Mercury merely cites to Insurance Code section 790.035, which imposes a civil penalty against an insurance company of $10,000 for each willful, unfair or deceptive act or practice defined in Insurance Code section 790.03. We agree with the court in *Century Surety Co. v. Polisso* (2006) 139

Cal.App.4th 922 [43 Cal.Rptr.3d 468] that "[t]his provision [(Ins. Code, § 790.035)] is not particularly useful where as here [the insurer] engaged in a course of conduct over a five year period that involved many prohibited acts, although no findings were made as to the exact number of those acts." (*Id.* at p. 967.) Thus, this factor can be properly excluded from the calculus of the constitutional maximum of punitive damages.

### 4. *Maximum Constitutional Award*

Based on the authorities and the facts of this case, we are convinced that the trial court's remittitur of punitive damages to $1.7 million is constitutionally excessive. "To state a particular level beyond which punitive damages in a given case would be grossly excessive, and hence unconstitutionally arbitrary, ' "is not an enviable task. . . . In the last analysis, an appellate panel, convinced it must reduce an award of punitive damages, must rely on its combined experience and judgment." ' [Citation.]" (*Simon, supra,* 35 Cal.4th at p. 1188.) Here, neither the interest in deterrence nor Mercury's substantial wealth can justify a punitive damages award of 10 times the amount of compensatory damages.

The $130,000 awarded by the jury in compensatory damages is the precise amount of damages that Amerigraphics sought. In light of the amount, there does not appear to be a punitive element to the compensatory damages award. In response to Amerigraphics's request for punitive damages in the amount of $3.4 million, Mercury's attorney argued in closing that a ratio of two-to-one, or even $500,000, might be appropriate as punitive damages, and would bear a reasonable relationship to the harm caused by Mercury. It is our task to determine independently whether an award is constitutionally excessive, and a party's consent is therefore irrelevant. (*Simon, supra,* 35 Cal.4th at pp. 1187–1188.) Still, we agree that $500,000 is an appropriate amount of punitive damages in this case, and is not constitutionally excessive. Amerigraphics, which thought it had insured itself against catastrophic loss, and faithfully paid its premium to Mercury, ultimately became a particularly vulnerable victim. Put simply, Mercury's egregious conduct put Amerigraphics out of business.

We therefore conclude that based upon the circumstances of this case, the maximum award of punitive damages consistent with due process is $500,000, an award based on a 3.8-to-one ratio of compensatory damages.

## DISPOSITION

The judgment is reversed insofar as it awards punitive damages of $1.7 million. The matter is remanded to the trial court with directions to modify the judgment by reducing the award of punitive damages to $500,000. In all other respects, the judgment is affirmed. Each party to bear its own costs on appeal.

Boren, P. J., and Chavez, J., concurred.