[No. D044779. Fourth Dist., Div. One. Jan. 30, 2007.]

JET SOURCE CHARTER, INC., Plaintiff and Respondent, v.
BRIAN J. DOHERTY et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is ordered certified for publication with the exception of Discussion parts I, II, III and IV.

**COUNSEL**

Niddrie, Fish & Buchanan and David A. Niddrie for Defendant and Appellant Brian J. Doherty.

John P. Mouyos, in pro. per., for Defendant and Appellant.

William P. Fennell for Defendant and Appellant Leslie T. Gladstone.

Rutan & Tucker, Richard K. Howell, Paul J. Sievers and Treg A. Julander for Plaintiff and Respondent.

## OPINION

**BENKE, J.**—The jury in this case determined that in locating and in negotiating the purchase price of aircraft on behalf of plaintiff, defendant aircraft dealers owed plaintiff the duties of a fiduciary. The jury further found that in providing plaintiff with misleading information about the negotiated price of the aircraft, defendants breached their fiduciary duty to plaintiff.

There is sufficient evidence in the record to support the jury's finding of liability. Although the parties did not have a written agency contract, their course of conduct and the customary practice in the aircraft industry fully supported a finding the aircraft dealers were plaintiff's agents and therefore obligated to provide plaintiff with accurate information about the price the aircraft dealers had negotiated with the sellers of the aircraft.

Although we agree the trial court erred in instructing the jury that both brokers and agents owe purchasers the duties of a fiduciary, in light of testimony from the aircraft industry experts offered by the parties and the record of willful deceit on the part of defendants, the error was harmless. Moreover, the record contains ample evidence from which the jury could reasonably infer the aircraft dealer had retained concealed secret profits equal to or greater than the compensatory damages awarded to plaintiff.

However, we reverse and remand as to the award of punitive damages with instructions that the trial court limit them on a pro rata basis to an amount which in total does not exceed the compensatory damages awarded. Where, as here, substantial compensatory damages have been awarded, and the conduct in question only involves economic damage to a single plaintiff who is not particularly vulnerable, an award which exceeds the compensatory damages awarded is not consistent with due process.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff and respondent Jet Source Charter, Inc. (Jet Source), was formed in 1997 by Richard McWilliam. McWilliam is the sole shareholder of Jet Source and its chief executive officer. At all pertinent times McWilliam was also the chairman and chief executive officer of Upper Deck, a sports memorabilia and trading card company. McWilliam devotes most of his time and energy to management of Upper Deck.

From 1997 to 1999 Jet Source's business consisted of chartering private aircraft and renting office and hangar space at Palomar Airport in Carlsbad. In 1999 McWilliam hired Steven Bogner, a pilot with marketing experience, to act as a full-time manager of Jet Source.

Defendant and appellant Mach I, Inc. (Mach I), was formed in 1998 by defendant and appellant John Mouyos. Mouyos is the sole shareholder and chief executive officer of Mach I. Mouyos has been a pilot since 1969. Mouyos flew contract missions for a number of government agencies, including the Department of Justice, and developed a number of relationships with people working in the aircraft industry throughout the world. Mach I is registered with the Federal Aviation Administration as an aircraft dealer. Mach I Aircraft, Inc. (Aircraft), was a second entity owned by Mouyos.[1]

Defendant and appellant Brian J. Doherty is also a licensed pilot. Like Mouyos, Doherty flew contract missions for government agencies and in that capacity befriended Mouyos. Doherty was an officer of Mach I and worked with Mouyos at Mach I.

In March 1999 Mach I began renting office space from Jet Source at the Carlsbad airport. Mach I executed a standard form lease which in part stated that neither party was the agent of the other.[2] Shortly after Mach I became a tenant of Jet Source, McWilliam, Bogner, Mouyos and Doherty met at Mach I's office and discussed Jet Source's interest in acquiring a particular airplane, a Falcon 50, serial No. 15. They also discussed Jet Source's general interest in acquiring aircraft for its charter business.

According to McWilliam, Doherty informed him that Mach I did not have the money to fund purchases or pay the expenses of inspecting aircraft. McWilliam understood that Mach I was offering to act as Jet Source's broker in acquiring aircraft for Jet Source and being paid an enhanced commission on the resale of the aircraft. McWilliam, on behalf of Jet Source, agreed to have Mach I act as its broker.

Between April 1999 and August 2001, Mach I assisted Jet Source in six aircraft transactions. According to McWilliam, Mach I located aircraft for purchase by Jet Source, negotiated the "lowest possible price" for the aircraft, and used Jet Source's funds to acquire the aircraft for Jet Source. Jet Source would then pay Mach I a commission of between 1 and 2 percent on the resale of the aircraft to third parties. In some instances Jet Source also paid

---

[1] Unless otherwise indicated, all references to Mach I include Mach I Aircraft.

[2] The lease stated: "15.7. No Agency. Nothing contained in this Agreement and no action by either party will be deemed to constitute any party or any such party's employees or agents to be employee or agent of the other party or will be deemed to create any partnership, joint venture, association, syndicate among or between any of the parties or will be deemed to confer on any party any express or implied right, power or authority to enter into any agreement or commitment, express or implied, or to incur any obligation or liability on behalf of the other party."

Mach I a commission on the acquisition of the aircraft. In all cases Jet Source paid Mach I's expenses in connection with the transactions.

In the first transaction in May 1999, Mach I negotiated a price of $9.7 million from Philips Electronics for the purchase of a Falcon 50, serial No. 15. However, Mach I represented to Jet Source that the price of the aircraft was $10.6 million and in fact produced a sales contract which reflected the higher price. Jet Source paid $10.6 million for the Falcon 50 and eventually resold it. During the course of discovery Jet Source obtained a sales contract which was largely identical in form to the sales contract initially provided by Mach I, except that it showed that Mach I only paid $9.7 million for the Falcon 50. An escrow statement Jet Source obtained through discovery showed that an entity known as Aircraft Dealer Services received $985,000 from the transaction. Mouyos conceded that Mach I controlled Aircraft Dealer Services and ultimately received the $985,000.

In the second transaction Mach I negotiated a purchase price of $9.4 million for a second Falcon 50 from Volvo. However, Mach I represented to Jet Source that the purchase price was $10 million and produced a purchase contract which reflected that price. Although in its discovery responses Mach I maintained that the negotiated price was $10 million, Jet Source established at trial the negotiated price was $9.4 million.

In the third transaction Mach I represented to Jet Source that it had negotiated a purchase price of $8.7 million for three Lear jets, when in fact the price for the three aircraft included $2.25 million in secret profits obtained by Mach I. In addition to the secret profits, Jet Source paid Mach I a buyer's commission of $75,000.

The fourth transaction involved another Falcon 50. Mach I negotiated a $10.3 million purchase price with the seller, Ronaele Aviation, Inc. However, Mach I provided Jet Source with a sales contract which showed a price of $10.85 million. At trial Doherty conceded that the sales contract appeared to have been altered.

In the fifth transaction Mach I obtained over $500,000 in undisclosed profits by using a "confidence company" it controlled to act as the purported seller of a Falcon 20.

In the sixth and final transaction Jet Source purchased a Cessna Citation from Cessna for $2.2 million and leased it back to Mach I. The parties agreed Mach I would bear the costs of maintaining the Cessna Citation as part of Jet Source's charter fleet, that they would split any profits upon resale, and that Mach I would bear the risk of any loss on the resale. After Mach I had failed

to pay the expenses of the Cessna Citation, Jet Source sold the aircraft back to Cessna for $950,000. It incurred a $1.25 million loss on the transaction.

According to Bogner, Mach I brought several proposed transactions a week to him during the period Mach I was acting as Jet Source's agent. During this period Doherty and Mouyos used Jet Source's credit cards to pay for approximately $100,000 in expenses they incurred in locating aircraft and negotiating with their owners. Although Mach I found propeller driven aircraft for other clients during this period, Jet Source was the only client to whom it provided jet aircraft.

## PROCEDURAL HISTORY

Jet Source sued Mach I, Mouyos and Doherty in August 2001. Initially, Jet Source's claims were limited to the losses it had suffered upon Mach I's breach of the Cessna lease. Later, Jet Source amended its complaint to include claims seeking to recover the undisclosed profits Mach I, Mouyos and Doherty had earned on the other five transactions on theories of fraud and breach of fiduciary duty.

The case was tried to a jury which returned a special verdict in favor of Jet Source. The jury found Mouyos and Doherty liable for intentional misrepresentation, negligent misrepresentation, breach of fiduciary duty, breach of contract and conversion. The jury awarded Jet Source $3,783,667 in damages for breach of fiduciary duty; $1.25 million for breach of contract on the Cessna lease and resale; and $20,396.90 for misuse of Jet Source's credit cards. In addition to compensatory damages the jury awarded Jet Source $11.4 million in punitive damages against Doherty and $7.6 million in punitive damages against Mouyos; the jury assessed $3.8 million in punitive damages against Mach I and $3.8 million in punitive damages against Aircraft. The trial court determined that Jet Source was entitled to $1.5 million in prejudgment interest.

The trial court denied defendants' motions for new trial and judgment notwithstanding the verdict. Judgment was entered on the jury's verdict and defendants filed timely notices of appeal.[3]

---

[3] John Mouyos filed a notice of appeal on behalf of himself and Mach I, doing business as Mach I Aircraft. This was the manner in which Mach I and Aircraft were denominated in the complaint and in the judgment entered by the trial court. Thereafter Mach I and Aircraft were the subject of bankruptcy petitions and the automatic stay provided by title 11 United States Code section 362. Those stays were lifted on January 24, 2006, and Mach I and Aircraft filed briefs simply joining in the briefs filed on behalf of Doherty. We deny Jet Source's motion to dismiss Mach I's and Aircraft's appeals. Because it replicated the manner in which those entities had been denominated in Jet Source's complaint and in the underlying judgment, the

## DISCUSSION

## I–IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V

Finally, defendants challenge the punitive damages awarded to Jet Source. We agree with defendants' contention that the punitive damages awarded in this case are excessive under the principles and holding in *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 419–427 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*Campbell*).

We review a punitive damage award de novo, "making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct. [Citations.] This '[e]xacting appellate review' is intended to ensure punitive damages are the product of the ' " 'application of law, rather than a decision-maker's caprice.' " ' [Citation.]" (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 [29 Cal.Rptr.3d 379, 113 P.3d 63], fn. omitted.)

### A. *Reprehensibility of Conduct*

■ " '[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.' [Citation.] We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. [Citation.] The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award

---

notice of appeal filed on behalf of Mach I and Aircraft was sufficient to preserve their right of appeal. (See *Luz v. Lopes* (1960) 55 Cal.2d 54, 59 [10 Cal.Rptr. 161, 358 P.2d 289]; *D'Avola v. Anderson* (1996) 47 Cal.App.4th 358, 361–363 [54 Cal.Rptr.2d 689].) Under title 11 United States Code section 108(c)(2), Mach I and Aircraft were not required to meet any other appellate deadlines until after the automatic stays were lifted.

*See footnote, *ante*, page 1.

suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. [Citation.]" (*Campbell, supra*, 538 U.S. at p. 419.)

In *Campbell* the defendant, a nationwide insurer, had been guilty of bad faith in defending one of its insureds in a wrongful death lawsuit. The state court awarded the insureds $1 million in compensatory damages for the 18 months of emotional distress they suffered as a result of the insurer's conduct. In addition the state court awarded the insureds $145 million in punitive damages based largely on evidence the insurer had engaged in unethical and oppressive conduct with respect to other insureds and its own employees. In characterizing the reprehensibility of the insurer's conduct, the court stated: "Applying these factors in the instant case, we must acknowledge that State Farm's handling of the claims against the Campbells merits no praise. The trial court found that State Farm's employees altered the company's records to make Campbell appear less culpable. State Farm disregarded the overwhelming likelihood of liability and the near-certain probability that, by taking the case to trial, a judgment in excess of the policy limits would be awarded. State Farm amplified the harm by at first assuring the Campbells their assets would be safe from any verdict and by later telling them, postjudgment, to put a for-sale sign on their house. While we do not suggest there was error in awarding punitive damages based upon State Farm's conduct toward the Campbells, a more modest punishment for this reprehensible conduct could have satisfied the State's legitimate objectives, and the Utah courts should have gone no further." (*Campbell, supra*, 538 U.S. at pp. 419–420.)

### B. *The Ratio Between the Harm Suffered by Plaintiff and the Punitives*

■ "Our jurisprudence and the principles it has now established demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [*Pacific Mutual Life Insurance Co. v. Haslip* (1991) 499 U.S. 1 [113 L.Ed.2d 1, 111 S.Ct. 1032]], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. [Citation.] . . .

"Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously

upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.' [Citations.] . . . The converse is also true, however. *When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.* The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*Campbell, supra,* 538 U.S. at p. 425, italics added.) Thus, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." (*Id.* at p. 426.)

In *Campbell* in discussing the compensatory award the insureds recovered and its relationship to the punitive damages, the court stated: "The compensatory award in this case was substantial; the Campbells were awarded $1 million for a year and a half of emotional distress. This was complete compensation. The harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries; and State Farm paid the excess verdict before the complaint was filed, so the Campbells suffered only minor economic injuries for the 18-month period in which State Farm refused to resolve the claim against them. The compensatory damages for the injury suffered here, moreover, likely were based on a component which was duplicated in the punitive award. Much of the distress was caused by the outrage and humiliation the Campbells suffered at the actions of their insurer; and it is a major role of punitive damages to condemn such conduct. Compensatory damages, however, already contain this punitive element. (See Restatement (Second) of Torts § 908, Comment *c*, p. 466 (1977) ('In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both')." (*Campbell, supra,* 538 U.S. at p. 426.)

### C. *Civil Penalties*

"The third guidepost . . . is the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.' " (*Campbell, supra,* 538 U.S. at p. 428.) In *Campbell* the maximum civil penalty for fraud was a $10,000 fine, which was entirely dwarfed by the $145 million in punitive damages.

In light of its consideration of all three factors, the court in *Campbell* found the federal Constitution would not permit an award of punitive damages which was greater than the compensatory damages. (*Campbell, supra,*

538 U.S. at p. 429.) The court in particular noted the substantial amount of compensatory damages and the fact that they already included a. punitive element. (*Ibid.*)

D. *This Verdict*

Application of the *Campbell* factors to the record in this case requires that the jury's punitive damages award be reduced.

Although, in the words of the *Campbell* court, the defendants' fraudulent scheme, repeated over a number of transactions, "merits no praise;" nonetheless, the harm the defendants caused was solely economic and did not involve, in any sense, a vulnerable victim. Indeed, Jet Source was a far less vulnerable plaintiff than the insureds considered in *Campbell.* Moreover, the total of $6.5 million in compensatory damages and prejudgment interest was, to say the least, substantial. (Compare *Bardis v. Oates* (2004) 119 Cal.App.4th 1, 23, 27 [14 Cal.Rptr.3d 89] [relatively small compensatory award justifies nine-to-one ratio of punitives to compensatory damages].) We must note however, that unlike the emotional distress damages awarded in *Campbell*, it is difficult to ascribe to this compensatory award a very large punitive element. The amounts awarded in compensatory damages were largely in the way of restitution to Jet Source for funds which had been improperly taken from it. Nonetheless, the total of $26 million in punitive damages awarded, representing four times the compensatory damages, is excessive viewed in light of the principles set forth in *Campbell*. In light of all the circumstances, we do not believe a total punitive damage award in excess of the $6.5 million compensatory award is appropriate.

Because varying amounts of punitive damages were awarded separately against all defendants, evidently reflecting the jury's determination as to varying degrees of culpability, we remand to the trial court for further proceedings by which it can reduce on a pro rata basis the punitive damage award so that the total does not exceed the $6.5 million compensatory award.[7] (See *Bardis v. Oates, supra*, 119 Cal.App.4th at pp. 21, fn. 8, 27.)

---

[7] We reject Doherty's argument that allocation to him of a pro rata share of $6.5 million in punitive damages would impose on him a penalty disproportionate to his ability to pay. Given Doherty's underlying conduct and his lack of credibility, in reviewing the record we are not bound by his statement of his net worth. (See *Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 581 [107 Cal.Rptr.2d 308].) Rather, our review of the record demonstrates that at the time of trial Doherty had access to considerable resources and that imposition as punitive damages of a pro rata portion of $6.5 million will not impoverish him. (See *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 625 [103 Cal.Rptr.2d 492].)

That portion of the judgment awarding punitive damages is reversed and remanded for further proceedings; in all other respects the judgment is affirmed.

Respondent to recover its costs of appeal.

McConnell, P. J., and O'Rourke, J., concurred.

A petition for a rehearing was denied February 28, 2007, and the opinion was modified to read as printed above.