Filed 6/20/23  S.A. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| S.A., | |
| Petitioner, | G062390 |
| v. | (Super. Ct. No. 20DP1072) |
| THE SUPERIOR COURT OF ORANGE COUNTY, | O P I N I O N |
| Respondent; | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY et al., | |
| Real Parties in Interest. | |

Original proceedings; petition for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, Mary Kreber Varipapa, Judge.  Petition denied.

Martin Schwarz, Public Defender, Richard Cheung, Assistant Public Defender, and Brian Okamoto, Deputy Public Defender, for Petitioner.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme and Marissa B. Hertzberg for Real Party in Interest P.A.

\*          \*          \*

S.A. (Mother) and A.A. (Father) are the biological parents of P.A. (the Minor). The Minor was taken into protective custody in August 2020 based on allegations of child abuse by Mother and Father against K.H. and Am.H., the Minor's older half siblings. (Mother and A.H. are the biological parents of K.H. and Am.H.) Child welfare proceedings were initiated and the juvenile court found the Minor to be within its jurisdiction. In March 2023, the court entered a disposition order determining, inter alia, the Minor was a dependent of the juvenile court, and setting the matter for a permanency hearing under Welfare and Institutions Code section 366.26. (All further statutory references are to the Welfare and Institutions Code, unless otherwise specified.)

Mother filed a petition for a writ of mandate or prohibition challenging two aspects of the disposition order: (1) the finding that reunification services need not be provided to Mother under section 361.5, subdivision (b)(6); and (2) the denial of a motion for placement of the Minor with a relative in Texas under section 361.3. We conclude the juvenile court did not err in its disposition order, and deny the writ petition.

FACTS

I. *Based on Allegations of Severe Physical Child Abuse to the Minor's Older Half Siblings, the Minor Is Detained*

On August 24, 2020, at approximately 1:00 a.m., Buena Park police were dispatched to a motel in Buena Park, California for a child abuse investigation. At the time, the Minor was 18 months old, K.H. was eight years old, and Am.H. was five years old.[1] (The family is from Houston, Texas, but was temporarily in California in August 2020.) One officer immediately observed K.H. had "bruising and welts to the right side of his face." K.H. also had "extreme bruising" and welts on his shoulders and arms in a pattern indicating he had been "hit with the studded side of a belt." Another officer discovered more marks on K.H.'s back and legs and below his armpits.

After being read her rights under *Miranda v. Arizona* (1966) 384 U.S. 436, Mother admitted she had "'whooped'" K.H. with a belt for being disrespectful. Although she was aiming for his bottom, he was moving around so she hit him on the arms and the side. Mother also admitted "she was so enraged at [K.H.]'s behavior, while hitting him with the belt, she wasn't paying attention to the marks on [K.H.]'s body."

K.H. was transported to a hospital for a medical clearance. The emergency room doctor provided photographs and test results to a child abuse pediatrician at the University of California Irvine Medical Center and the Child Abuse Services Team (CAST) Medical Unit. That pediatrician observed "numerous large bruises to his right face, thighs, arms and upper back, many of which are patterned. Bleeding labs performed are normal, therefore there appears to be no overt problem with his ability to clot. There has not been accidental trauma history provided to account for all of these current

---

[1]     This writ proceeding involves only the Minor. K.H. and Am.H. will be addressed in this opinion as necessary. Where appropriate, the Minor, K.H., and Am.H. will be referred to collectively as the children.

bruises, especially the patterned bruises. These injuries are most consistent with inflicted trauma (child physical abuse)."

A forensic examination of Am.H. by a pediatrician with the CAST Medical Unit showed "[Am.H.] has multiple linear, curvilinear, looped, red marks that [Am.H.] stated are from a whooping with a jump rope on more than one occasion. The marks are from an object that can be looped and has a small diameter, which could be a jump rope. The marks are of different ages – acute (fresh) and some are older (diffuse and/or hyperpigmented). The multiple patterned bruises are from more than one event of physical abuse." Am.H. had a scar on her chest; Mother explained she had had open heart surgery in 2017 to mend holes found in her heart and she will eventually need a pacemaker.

When questioned by a social worker, K.H. initially came up with excuses for the marks on his body. Eventually K.H. admitted Mother disciplined him with a belt and Father hit him with his hands. Sometimes Mother would hit him so hard he bled. K.H had to be quiet when he was being hit so the neighbors would not contact the police. He was afraid Mother would learn he was telling the social workers what happened; Mother and Father had told the children not to say what went on because they did not want to go to court. The abuse did not stop until K.H. was removed from Mother and Father.

Am.H. told the social worker she and K.H. were regularly beaten by Mother and Father with belts, ropes, and phone charging cords. She had significant bruising on her body. The abuse had occurred in California and Texas. Like K.H., she had been told not to tell anyone about the abuse, and she was afraid Mother and Father would whoop her if they found out she told about the earlier whoopings.

Mother and Father were arrested and charged with two counts of willfully inflicting cruel or inhuman corporal punishment on a child. (Pen. Code, § 273d, subd.

4

(a).)  The Minor, K.H., and Am.H. were placed with licensed foster care provider Dana R. (the caregiver).

II. *A Child Welfare Petition Is Filed*

The Orange County Social Services Agency (SSA) filed a petition alleging the Minor came within the juvenile court's jurisdiction under section 300, subdivisions (a) (serious physical harm), (b)(1) (failure to protect), (g) (no provision for support), and (j) (abuse of sibling).  The petition also alleged section 300, subdivision (c) (serious emotional abuse) and applied to K.H. and Am.H., and subdivision (i) applied to K.H.  The petition alleged Mother and Father subjected K.H. and Am.H. to significant physical abuse, both were incarcerated, Mother had unresolved mental health issues, and A.H.'s whereabouts were unknown.  There were no allegations, and there was no evidence, of physical abuse of the Minor.

Mother pleaded guilty to the criminal charges of child cruelty.  After Mother was released from jail, she moved back to Houston.

III. *After the Minor Is Placed with K.H. and Am.H. in the Caregiver's Home, K.H. and Am.H. Provide Further Information Regarding Physical and Emotional Abuse*

After being placed with the caregiver, K.H. exhibited increasingly difficult behavior at bedtime and told the caregiver "he wished that he could just kill himself."  He was troubled about ongoing thoughts he wanted "out of his head."  K.H. confided in the caregiver he would get "whoopings" with extension cords when there were any issues with his schoolwork, and the beatings would continue if he made noise or moved while being beaten.  He and Am.H. had to stand in the corner without sitting for hours.  They were punished by being given only bread and water for days at a time.  K.H. would be left at home alone, or be required to take care of his sisters.  Mother would whip his hamstrings so hard he could not lay down to sleep at night.  She punished K.H. and Am.H. by making them lie on their backs and hold their legs slightly off the ground.  They would get another beating if they put their legs down or held them "up too high."

5

During one beating K.H. was in so much pain he moved, so Mother taped his feet to the floor. He broke free and started running to his grandmother's house, but Mother caught him. She then put super glue on his hands and feet and "stuck all of them to the floor" and then beat him. Eventually, Mother used a knife to cut one of his hands free and gave him the knife to free his other hand and his feet; K.H. cut his hand in the process.

K.H. also told the caregiver Mother taped him to the couch and beat him with the curtain rod. Mother sat on him for one hour while he was face down on the couch; he said that "'was the worst one ever'" because he could not breathe. Mother then sat on Am.H., but only for about 20 minutes because of her heart problem; Am.H. was screaming.

K.H. told the caregiver Father also emotionally abused him by telling his school class he pees on the couch and still has accidents. Father also beat K.H. with a piece of wood with nails in it.

On the night the children were detained, Mother was trying to beat K.H., but he was moving around too much. She then threatened to kill him. She told Father "to take over and stated 'now you're really going die.'" Father beat K.H. so hard "he could feel the hits 'all the way to my bones.'" K.H. screamed to Mother, "'help me he's going to kill me,'" but Mother just stood there watching. K.H. told the caregiver Mother had a pistol in her purse as well as a shotgun, and Father had an assault rifle and an Uzi.

K.H. later made more disclosures to the caregiver about the abuse inflicted by Mother and Father. While they were living in Texas, K.H. got in trouble when he got a doughnut from the kitchen for his maternal great-grandmother. Mother "put him in a push up position, and whooped him with an extension cord." The maternal grandmother and great-grandmother tried to stop Mother, but she pulled a gun on them. The maternal grandmother and great-grandmother called S.C., A.H.'s aunt, and asked her to help calm

6

Mother down. Father then arrived, and "it got worse from there," but K.H. did not want to provide any more details.

K.H. also told the caregiver about observing acts of domestic violence by Father against Mother. The maternal grandmother took Mother to the hospital after Father stepped on Mother's neck, beat her up, and burned her forehead with cigarettes. On another occasion, Father dropped a case of water on Mother.

Am.H. also told the caregiver Mother hit her with a wire hanger. Am.H. said she would be slapped in the face if she looked down while she was walking. The children would be slapped in the face if they were not wearing socks in the house. As a punishment, they would have to hold a watermelon with their arms stretched out in front. Punishment also included being fed a frozen corn dog and having to wait until it thawed to eat it. They would also be told when they could use the bathroom. If the children did not write their name on their water bottle, Mother threatened to put dirt in their water and make them drink it.

In a CAST interview in November 2020, K.H. said "it was bad living in Houston due to the whoopins, being slapped in the face and [Father] hitting him on the bottom with a metal curtain rod." He "stated whoopins included being hit on his bottom with a belt and [Mother] and [Father] would make him stay still." One time, he could not stay still and Mother glued his shoes to the floor. Mother hit him on the legs and his bottom, in front of his sisters.

K.H. also stated in the CAST interview Mother had given Father permission to give K.H. "'whoopins'" and Father hit harder than Mother. Father hit him with a belt, metal hangers, and "lots of other stuff." On one occasion Father slapped K.H. across the face, and Mother put makeup on the mark and told him not to tell anyone about it. When his teacher asked what happened, K.H. did not tell her the truth, but the teacher spoke to Mother about it. When they got home, Mother hit him on his bottom, legs and back with a piece of wood, believing he had disclosed the abuse to the teacher.

7

K.H. said he was sometimes beaten so severely he could not sit on a chair and had to squat to sit down.  The abuse continued until the police intervened in Buena Park.

K.H. also told the CAST interviewer he had witnessed domestic violence between Mother and Father but Mother told him not to talk about it.  Mother and Father fought with their hands and with other objects; Father threw chairs at Mother, pulled her hair, and stood on her body.  Father threatened to hurt Mother if she told anyone about the abuse.  Once Mother went to the hospital after a beating due to a "headache."  K.H. saw Father hit Mother with the side of a pistol "on top of her head and her jaw."  K.H. was scared and crying in his bed; Father pointed the pistol at K.H. and threatened to kill him if he did not "shut up."

Am.H. was also interviewed by CAST in November 2020, and told the CAST interviewer about an incident where K.H. was given a "whoopin" with a towel just because he was standing outside the bathroom.  Another time Father hit K.H. above his left eye and Mother did nothing about it.  Father gave most of the "whoopins" with a jump rope or "with nails on a belt."  Mother often used a belt to beat her and K.H.

Am.H. also witnessed Mother and Father throw things at each other and saw Mother's injuries, including an injury on her forehead above her eye; she was unable to provide more details because it was too difficult to talk about.  She confirmed Mother carried a gun in her purse and Father had a large gun he "sho[o]ts in the air."  The maternal grandmother and maternal great-grandmother knew about the abuse because they heard the children scream and saw their injuries.

Father made K.H. "smoke weed."  He was crying and got a headache; Mother put his head in the freezer and said Father would make K.H. smoke again if he caught him crying.  Am.H. also saw Father give K.H. "whoopins on his private parts with a belt."  Am.H. said they "received lots of whoopins" while living in Texas.

8

IV. *S.C. Seeks Relative Placement*

In September 2020, K.H. and Am.H.'s paternal great aunt, S.C., requested placement of the children in Houston, Texas. Interstate Compact on Placement of Children (Fam. Code, § 7900 et seq.) (ICPC) paperwork was completed by SSA and submitted to the Texas Department of Family and Protective Services (DFPS). A preliminary home study for S.C. was completed in February 2021. As of June 2021, the ICPC was still open and the Texas DFPS has not made any decision. The Minor and Am.H. participated in video calls with S.C. K.H. did not want to participate in these calls; he told the caregiver S.C. had been aware of the abuse inflicted by Mother and Father, but had done nothing to stop it. On one occasion, K.H. recalled, S.C. had been called to help calm Mother down when she was beating K.H.

V. *The Minor Does Not Participate in Virtual Visitation, but Minor Does Well with the Caregiver*

Mother and Father were authorized to have video calls with the Minor. Father generally spent less than five minutes communicating with the Minor. The caregiver reported the Minor "wants no part of the visit and pays no attention to them and usually hides."

At the time she was placed with the caregiver, the Minor was nonverbal, and the caregiver expressed concern about the Minor lagging in language development. In January 2021, the caregiver reported the Minor's interactions with the caregiver were improving and her responses were becoming more appropriate. She received services at the Regional Center.

An evaluation suggested a diagnosis of autism. "[The Minor]'s social and behavior skills are delayed for her age. Th[is] means emotional regulation and social interactions are challenging for her. [The Minor] needs a consistent and structured environment to help her learn to express and manage her emotions in a healthy manner, especially when routine changes or she needs to adapt to a new environment. Developing

9

positive and reciprocal social interactions will be important for her to get assistance with as she continues to grow and develop. Behavioral Health Treatment (BHT) is recommended which includes a Functional Behavior Analysis (FBA) and Applied Behavioral Analysis (ABA) to help [the Minor] with problematic behaviors and emotional development."

VI. *The Minor is Found to be Within the Juvenile Court's Jurisdiction.*

At a bifurcated jurisdiction hearing in March 2021,[2] the juvenile court found the allegations in the first amended petition true within section 300, subdivisions (a), (b)(1), (c) and (g) as to the Minor, and set a disposition hearing in May 2021.

VII. *The Minor Does Not Want to Participate in Virtual Visits and S.C. Visits in Person*

In a May 2021 addendum report, SSA noted the caregiver had reported the Minor did not want to engage with Mother during the virtual visits. Father had not reached out to the caregiver to schedule any virtual visits. The caregiver reported S.C. was initially not consistent in calling on her scheduled visitation days, but had called on Christmas Day to watch the children open their presents from her; the caregiver noted that S.C. gave several gifts to K.H. and Am.H. but only one gift to the Minor. Since April, S.C. had been consistent in calling.

In June 2021, S.C. contacted SSA to express concern that the caregiver had been attacking her character with Texas DFPS regarding her ability to care for the children. S.C. claimed that in Texas before the child welfare proceedings began, she only saw the children on special occasions, and never witnessed any physical discipline by

---

[2]     The jurisdiction/disposition hearing was scheduled to occur in October 2020. In the jurisdiction/disposition report, SSA requested that the hearing be continued to allow further investigation to be conducted. The juvenile court continued the hearing for one month. SSA again requested a continuance for further investigation, and the jurisdiction hearing was continued for two more months. Because of the court's unavailability, the hearing was again delayed until March 2021.

Mother or Father. S.C. said she did not use physical discipline. As an educator, she felt qualified to care for the children and their special needs. S.C. was willing to adopt the Minor as well as K.H. and Am.H., and stated the children had a good relationship with her own son. S.C.'s background check in Texas had been clear, and SSA told her she could have unsupervised visits with the children if she traveled to Southern California.

In July 2021, DFPS closed its in-house fostering/adopting department and advised it would not be able to proceed with licensing S.C. in Texas. S.C. nevertheless moved forward with the help of a private adoption agency.

Later that month, S.C. traveled to California for an in-person visit with the Minor, K.H., and Am.H. All parties enjoyed the visit; K.H. said it was a 10 out of 10, and Am.H. said it was "'[a]wesome.'" In June 2022, S.C. had a second, multi-day, overnight visit with Am.H. and the Minor, but K.H. chose not to attend.

VIII. *The Caregiver Moves for Specific Placement and S.C. Moves for Relative Placement*

On July 26, 2021, the caregiver filed a section 388 motion asking the juvenile court to order specific placement of the Minor, K.H., and Am.H. in her custody and care. The caregiver also filed a motion to be granted de facto parent status, which was granted when the disposition hearing began.

On August 12, 2021, S.C. moved for relative placement pursuant to section 361.3. Texas Health and Human Services had determined S.C. was eligible to be a foster parent.

In July 2022, the juvenile court concluded it had jurisdiction over the matter because the Texas court had failed to assert jurisdiction. A.H. filed a notice of appeal from the court's orders regarding application of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) (Fam. Code, § 3400 et seq.), and requested the matter be transferred to Texas. In a published opinion, this court affirmed the

11

juvenile court's assertion of jurisdiction.  (*A.H. v. Superior Court* (2023) 89 Cal.App.5th 504.)

IX. *Mother's Participation in Services Is Minimal and Father Does Not Communicate with SSA and Does Not Participate in Services*

Mother was provided referrals for services by the social worker.  She had limited ability to participate in services while she was in jail, but she completed parenting packets.  After her release from jail, she returned to Texas and could not locate a child abuser's treatment program, one of the required parts of her case plan.  The social worker gave Mother resources for services in Texas, but Mother complained 90 percent of them were unhelpful.

Mother denied most of the allegations in the child welfare petition.  She claimed she provided safety for the children, and neither she nor Father abused the children.  She stated the Minor was not physically abused because she was just a baby.  She also complained the children's words had been twisted by SSA to make her look like a monster.  She did not believe K.H. did not want to reunify with her.

Mother started a counseling class in Houston in March 2021.  She participated in parenting classes, found a support group, and completed an online book designed to assist her decision making.  She also completed a course on "Adult Decision Making/Thinking for Change/Impulse Control/Criminal Behavior Education."

Mother denied any domestic violence with Father; she became defensive and accused K.H. of making false statements.  Mother claimed she and Father had separated, but would not provide further information about their relationship.  She showed no insight as to how her actions affected the children, minimized her actions, and showed little if any remorse for the harm she caused.

Mother told the social worker her first therapist said the therapy was not working and Mother did not believe she needed counseling.  The therapist told the social worker Mother's case was closed in April 2021 because Mother would not talk about

12

what happened with the children. The therapist thought Mother should work with a therapist specializing in clients mandated to attend therapy. As late as September 2021, Mother did not understand why domestic violence was a part of her case plan.

A second therapist discharged Mother from counseling because she refused to talk about parenting, her past relationships, and the abuse and neglect of her children.

In July 2022, Mother stopped responding to the social worker. Mother insisted further communication with SSA must go through her attorney.

Father did not respond to SSA and did not visit the Minor, either by video or in person. SSA had no contact with him after December 2020. In June 2021, SSA discovered criminal charges had been filed against Father in Houston, Texas.

Because Mother and A.H. live in Texas, all visitation has been virtual. K.H. did not participate in visitation because contact with his parents and relatives triggers bad memories of the abuse he suffered. Am.H. and the Minor initially engaged in visitation, but later declined to. At one point the Minor expressed interest in visiting with Mother, but when a virtual visit was set up, she declined.

X. *K.H. and Am.H. Make Further Allegations of Abuse*

In August 2022, K.H. met with the social worker; he had written a list of the ways in which he was abused so he could remember to disclose them. In addition to the acts of abuse he had previously disclosed, the list noted Mother stabbed him in the leg while beating him with a broken metal mop handle, scrubbed him with a horse brush, woke him for the sole purpose of beating him, forced him to urinate in water bottles and defecate in cans outside for at least two months, withheld food as a punishment, held his hand over a fan while Father acted like he would chop off his fingers, made him hold heavy objects (watermelons, crock pots) in front of him, made him eat out of a trash can when he woke her up asking to eat, and made him perform push-ups on hot, broken concrete. Mother watched Father abuse K.H. and did not intervene. When Mother

13

thought K.H. had gotten out of the shower too soon, she forced him back in under scalding water.

K.H. told the social worker Mother began abusing him when he was five years old, before she became involved with Father, but the beatings were worse after Father showed up. K.H. stated his biological father, A.H., was aware of the abuse. Although he believed A.H. "would probably protect him" he did not want to stay with A.H. if he had to go back to Texas. K.H. would rather stay in California, and on the list wrote "If I go to [T]exas they will kill me," referring to Mother and Father. K.H. believed Mother and Father were still together. K.H. saw domestic violence between Mother and Father on a regular basis. Mother had visible bruises caused by Father.

XI. *The Contested Disposition Hearing*

Although the disposition hearing was set for May 2021, because of delays, some of which involved a dispute as to whether Texas or California should be adjudicating the child welfare proceedings, the hearing did not begin until October 2022, and continued over multiple dates through March 2023.

A. *K.H.'s Testimony*

K.H., who was by then 10 years old, testified he would like to live in California with the caregiver because he felt safe with her. He called the caregiver "mom" and hoped she would adopt him, Am.H., and the Minor. He gets along with Am.H. and the Minor and wants to stay together with them.

He was worried that if he went back to Texas Mother and Father would find him. He was also afraid that if he were to visit with Mother or A.H. in person, he would have flashbacks or nightmares. K.H. testified being with S.C. brought flashbacks and bad memories because S.C. knew about the physical abuse he was suffering but did not do anything to stop it.

14

B. *The Social Worker's Testimony*

    The social worker testified the recommendation was not to offer reunification services to Mother or Father because Mother and Father inflicted severe physical abuse on K.H. and Am.H. Further, the social worker testified Mother would not benefit from further services because she was "not engaging in the process with [the] social worker and [she was] not having visits, [so] there is no way for me to be able to assess if you've actually made changes to your behavior for me to be able to say this child is safe to be able to return to you." Mother was argumentative and did not show any insight into what the children went through. Specifically, Mother denied her actions were abusive, claimed she was simply disciplining the children, and did not acknowledge the children had been hurt and beaten. Father had not been in contact with the social worker since October 2020.

    The social worker had been informed by a family member that Mother and Father were still in a relationship. This caused the social worker concern because their relationship had previously been marked with domestic violence, and there was no indication anything between them had changed. The social worker believed the children would be at substantial risk of physical and emotional harm if they were returned to the custody of Mother or A.H.; that Mother inflicted severe physical harm on K.H. and Am.H.; that it would not benefit the children in any way to pursue reunification with Mother; and that the Minor would be at substantial risk of physical and emotional harm if she were returned to Father's custody. The social worker's recommendation that family reunification services not be provided to Mother considered the children's best interests. The social worker did not believe Mother could protect the children from harm.

    The social worker did not believe placement with S.C. in Texas was appropriate because she felt K.H.'s concerns about S.C.'s knowledge of the abuse were founded. Although she did not believe S.C. would harm the children, the social worker was concerned the parents would find the children and harm them, even if they were

15

under S.C.'s care. The social worker believed placement with S.C. would not be safe for the children, although she was licensed as a foster parent by the state of Texas, because she had knowledge of the past abuse but did nothing to stop it. The social worker recommended that the children remain in their current placement.

The social worker testified that moving to Texas would be a difficult adjustment and negatively affect the emotional well-being of the Minor because she had been thriving in the caregiver's care for two and one-half years—more than half her life. The social worker had no concerns about the quality of care provided to the Minor by the caregiver. The social worker had observed the Minor "blossomed, just became very social, very chatty, very wanting to play with her siblings, more wanting to interact, maybe a little mischievous at times" after being placed with the caregiver. The Minor was in applied behavioral analysis therapy.

The social worker testified the children are attached to each other, and she believed it would be emotionally detrimental and traumatic for the children to be separated from each other.

All three children were bonded to the caregiver; they easily engaged with her, smiled and laughed together, interacted positively, and they showed her respect. It would be difficult for the children to be removed from the caregiver because they are attached to her, they have stability with her, they feel safe with her, and they do not have a relationship with anyone in Texas. It was not in the children's best interests to go to Texas at that time because they were stable and safe in the current placement. Their denial of visits indicated they did not want to move to Texas, and forcing them to do so would create challenges.

The social worker did not recommend the children be placed with S.C. after the ICPC was approved in November 2021 because she was unaware she needed to make such a recommendation; she had informed the juvenile court of the approval. S.C. had no

16

in-person visits with the children since June or July 2022. She had no virtual visits with the children since September 2022, because the children did not want to have visits.

C. *The Caregiver's Testimony*

The caregiver reiterated the social worker's testimony that S.C. had not visited the children in person since the previous summer, and had not had any virtual visits since September 2022. S.C. did not send presents or gifts or make a phone call for Christmas 2022. When she sent gifts, she would send several gifts each for K.H. and Am.H., and only one or two for the Minor. One year she called K.H. and Am.H. on their birthdays, but did not call the Minor.

The caregiver testified the children were bonded to her and called her "mom." The children were a "very close sibling set" and the Minor loves her siblings and plays with them all the time.

D. *S.C.'s Testimony*

S.C. saw K.H. and Am.H. for two or three hours every three weeks from their birth when Mother did her hair, as well as on holidays.

S.C. denied being aware of any abuse suffered by K.H. and Am.H. She never saw bruises on either child, K.H. never seemed afraid of Mother, and neither child seemed afraid of A.H. A.H. never told her he had concerns about K.H. and Am.H. in Mother's care. She never saw Mother chastise the children, raise her voice at them, get frustrated with them, be inappropriate with them, lose her temper with them, raise a hand to them, or hit them. Hearing about the abuse surprised her because "the children were always happy, engaging with myself and my son, and in there, I didn't see any indication that they were being abused." Mother cut off contact with S.C. when Mother broke up with A.H. and married Father. S.C. believed the physical abuse of K.H. and Am.H. was a one-time thing.

17

S.C. had concerns about the children being around Mother in the future but not around A.H. S.C. did not believe A.H. was a risk to the children. If she learned A.H. was on probation for a violent crime, it would change her opinion. If the children were placed with her, she would take any necessary steps to protect them from Mother and A.H. (if appropriate). She testified she had concerns about Father having contact with the children, and did not know if he was still in a relationship with Mother.

S.C. was aware that the Minor, K.H., and Am.H. were bonded and "really love each other." She loves the Minor like her own child and considers the Minor to be a member of her family. She would be willing to accept care of only the Minor if K.H. and Am.H. could not be placed with her or if they reunified with either of their parents. She was willing to provide permanency for K.H., Am.H., and the Minor. She would still want a relationship with the children even if the juvenile court decided it was not in their best interests to be placed with her. She wanted to continue having regular visitations. She had experience working with children who have ADHD, autism, and physical disabilities, including heart conditions, and had no concerns about her ability to care for K.H., Am.H., or the Minor. S.C. had the financial means and educational resources to support the children, and her home was immediately ready for the children.

E. *A.H.'s Testimony*

A.H. currently lives in Houston with his grandmother. When they were living in Houston, K.H. and Am.H. generally stayed with him every other weekend but then they stopped. A.H. admitted using a "belt or two on the behind" as discipline on his children.

A.H. defined a whooping as spanking with a belt; he never saw Mother whooping either K.H. or Am.H. A.H. never saw signs Mother was physically abusing K.H. and Am.H., and they never told him she was doing so. During his seven or eight

18

year relationship with Mother, he never saw her yell at, use a belt on, or grab K.H. and Am.H., and never saw a bruise on them or saw them afraid of or unwilling to go to her.

On Mother's Day 2020, A.H. heard Mother say if Am.H. left the house with A.H. "she would beat her ass." He did not call law enforcement because he didn't believe Mother would really do that. He didn't take Am.H. from Mother's house that day because he didn't want to cause a confrontation with Mother in front of the children.

Sometime in 2020, A.H. was threatened by Father on Facetime, and called the police as a result. He informed the police Father was the boyfriend of the mother of his children, who lived with Mother, and he was concerned for the children as well as himself. He was not aware of whether the police ever did anything about it. He was not aware of the specifics of the abuse suffered by K.H. and Am.H., although he knew it would be important to avoid triggers. He had discussed with his counselor how to assist the children in processing and recovering from trauma and how to be supportive of the children.

In 2020, A.H. was arrested and jailed for aggravated assault with the use of a knife, and burglary. He was on probation until at least 2025. He was also arrested for aggravated assault with the use of a knife in 2018. He had at least one conviction for controlled substances.

A.H. was not aware Mother had taken K.H. and Am.H. to California until he was contacted by SSA and informed they had been taken into protective custody.

Although A.H. tried to engage in virtual visits with the children, he understood they were able to decline visits. Although A.H. heard K.H. testify he did not want to return to Texas, A.H. did not understand why he wouldn't want to come back home. He believed his ability to bond with Am.H. was affected by only having virtual visits for half an hour twice a week. A.H. wanted K.H. and Am.H. returned to his custody, and wanted the Minor to remain with her half-siblings. A.H. believed there was

19

room in his home for K.H., Am.H., and the Minor; no one from SSA had ever visited his home in person or by video.

A.H. had participated in counseling and substance abuse treatment. He was drug testing with his probation officer and through SSA. Because of the services he had received, he believed he was now mature enough and mentally prepared to be able to care for the children.

A.H. supported placement with S.C. and believed she could safely care for the children. He had no concerns about the children's current placement with the caregiver. He wanted the children returned to him instead of remaining with the caregiver "[b]ecause I'm their father, and I would like a chance to show them that they're safe with me . . . ." Although K.H. did not want to return to Texas, A.H. was not giving up on his desire to reunify.

F. *The Court's Ruling*

All reports prepared by SSA were admitted into evidence.

The juvenile court found S.C.'s testimony credible. The court also found K.H.'s testimony credible, and gave weight to K.H.'s testimony he did not feel safe with S.C., and wanted to remain with the caregiver. The court found the caregiver did not interfere with reunification and K.H.'s testimony was not unduly influence by the caregiver.

The juvenile court denied S.C.'s motion for relative placement under section 361.3. The court made the following findings relevant to S.C.'s placement request: (1) S.C. was willing to take all three children, permanently or temporarily; (2) she would support reunification with A.H.; (3) she would do whatever the court or SSA directed her to do; (4) she took immediate and absolute steps to help the children within days of learning they had been detained; (5) her home was suitable and she had unique and special skills regarding the children and their particular needs; (6) there was no issue

20

regarding her moral character; (7) S.C. did not have a close relationship with the children; (8) she either did not have enough contact with the children to see or recognize the extensive abuse they were suffering, or she did have a close enough relationship but did not recognize the signs of abuse; and (9) K.H. did not feel safe with S.C. because he believed she knew about the abuse. Based on all the foregoing, the court found it was not in the children's best interests to be placed with S.C. because of their need for psychological and emotional stability, the "very high complex-trauma nature of this particular case," and the lack of a significant relationship between S.C. and the children. The court noted it had done an independent review of the criteria under section 361.3 and had given full consideration to the Family Code section 7950 mandates.

The juvenile court also denied the caregiver's specific placement order because it did not want to "tie the hands of social services." The court ordered that SSA should retain discretion on placement, and would be required to give 30 days notice to all parties before changing placement.

The juvenile court found by clear and convincing evidence that reunification with Mother and Father would be detrimental to the Minor's well-being. "[W]hile the court . . . did not sustain the torture allegation, . . . the extent of the abuse in this case is, in fact, severe, and it cannot be thought of otherwise, and it is not only the physical abuse, but also the ongoing emotional and mental abuse. [¶] . . . [¶] The evidence that we received in this matter supports that it is a situation that is recently understood to cause serious emotional damage. I have [K.H.] who, as a result of all that happened, was indicating a sigh for purposes of the record, in addition to other extraordinary mental health needs. [¶] So, despite the flourishing situation we have now, the situation that was presented was one of grave concern."

The juvenile court declared the Minor to be a dependent of the court. (§ 360, subd. (d).) The court found by clear and convincing evidence the circumstances justified removing the Minor from Mother and Father's physical custody. (§ 361,

21

subd. (c)(1), (3), (5).) The court found by clear and convincing evidence reunification services need not be provided to Mother and Father (§ 361.5, subd. (b)(6)) and adopted SSA's recommendation that family reunification services not be provided to Mother and Father. The court set a permanency hearing for the Minor under section 366.26. Mother timely filed a notice of intent to file a writ petition challenging the juvenile court's orders.

DISCUSSION[3]

I. *Denial of Family Reunification Services Under Section 361.5.*

Mother's first challenge to the disposition order is to the juvenile court's denial of reunification services to Mother. "When a child is removed from a parent's custody, the parent generally must be provided with family reunification services. [Citations.] There are 'narrowly specified exceptions' to this rule, however [citation], as set out in section 361.5, subdivision (b). The application of these exceptions in the juvenile court is subject to a clear and convincing standard of proof. [Citation.]" (*J.J. v. Superior Court* (2022) 81 Cal.App.5th 447, 455.) In this case, the court found by clear and convincing evidence that reunification services need not be provided to Mother because the Minor was "adjudicated a dependent pursuant to any subdivision of [s]ection 300 as a result of . . . the infliction of severe physical harm to . . . a half sibling by a parent . . . and the court [made] a factual finding that it would not benefit the child to pursue reunification services with the offending parent . . . ." (§ 361.5, subd. (b)(6)(A).)

Once the court finds that reunification services need not be provided under section 361.5, subdivision (b), "*denial* of reunification services is *mandatory*, not discretionary, with respect to nearly all of the bypass provisions, unless the court makes certain countervailing factual findings." (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1141.) Because the court found Mother inflicted severe physical harm to the Minor's half-

---

[3] Counsel for the Minor filed a brief joining all of SSA's arguments on appeal and requesting affirmance of the juvenile court's orders.

sibling, the court was not authorized to order reunification services unless it found, "by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).) In this case, to the contrary, the court found reunification with Mother would be detrimental to the Minor's well-being. Substantial evidence under the heightened burden of proof supports these findings. (*In re L.O.* (2021) 67 Cal.App.5th 227, 245.)

Section 361.5, subdivision (i) lists the factors the juvenile court must consider in determining whether reunification services will benefit the child. In this case, the factors that are relevant all support the finding reunification services would not benefit the Minor. As detailed *ante*, the specifics of the physical harm inflicted on K.H. and Am.H., the circumstances under which that harm was inflicted, and the severity of the emotional trauma the children suffered as a result were significant and shocking. (§ 361.5, subd. (i)(1)-(3).)

While there is no evidence of abuse of children other than K.H. and Am.H., the length and severity of their abuse tends to negate this factor. (§ 361.5, subd. (i)(4).) The Minor is too young to express an opinion about reunifying with Mother. (*Id.*, subd. (i)(6).) It bears noting, however, that the Minor has refused to participate in virtual visitation with Mother, and she has spent more than half of her life with the caregiver, having been detained at age 18 months, and spending the last 34 months with the caregiver.

Finally, there is little if any likelihood the Minor could be returned to Mother's care without continuing supervision within 12 months. (§ 361.5, subd. (i)(5).) The child welfare proceedings have already gone on for almost three years and are outside the maximum time allowed for reunification. (See *id.*, subd. (a)(1)(B) [when child is under three years old when initially removed, services may not be provided for more than 12 months]; *id.*, subd. (a)(3)(A) [services may be extended to maximum of 18 months if the child will be returned and safely maintained in the home during that

23

period]; § 366.22, subd. (b) [if parent has consistently visited and has made significant and consistent progress in resolving problems leading to child's removal, additional services may be provided at permanency review hearing if there is substantial probability child will be returned to parent's custody within 24 months after original removal date].)

Mother has yet to benefit (or show any potential benefit to the Minor) from the services she has been provided. While in her petition Mother contends she "has already taken significant steps toward minimizing risks to her children," none of the services she has completed shows she has acknowledged the suffering she caused the children or taken the necessary steps to ensure such abuse will not occur again.[4]

Mother failed to even address the abuse of the children with two different therapists, and continued to deny the severity of the abuse or understand why the domestic violence between her and Father was an issue in the child welfare proceedings. Mother admitted early on that the Minor was not subject to physical abuse because she was a baby. But the Minor is now almost four and one-half years old, nearly the age Am.H. was when these proceedings began. Mother has not offered any reason for the juvenile court to believe the Minor would not be subject to the same abuse suffered by K.H. and Am.H. if she were returned to Mother's care.

We acknowledge that Mother herself was the victim of severe physical abuse at the hands of Father, and that she should not be viewed as a "one-dimensional abuser." But the juvenile court's findings that Mother had not taken any steps through the services already provided to address her own abuse, much less the abuse inflicted on

---

[4] Mother finished a parenting course and requested another, participated in counseling which she acknowledges was not successful, completed a course on decision-making, completed a psychological assessment, and completed a substance abuse assessment. During the pendency of these proceedings, Mother gave birth to another baby that was voluntarily placed with a relative in Texas. Mother is receiving family preservation or voluntary family services for that child in Texas.

24

the children, was supported by substantial evidence, and amply justifies the court's finding that further reunification services would be detrimental to the Minor.

Mother argues the juvenile court violated section 361.5 by failing to "read into the record the basis for a finding of . . . the infliction of severe physical harm under paragraph (6) of subdivision (b)," and failing to "specify the factual findings used to determine that the provision of reunification services to the offending parent . . . would not benefit the child." (§ 361.5, subd. (k).) As to the application of section 361.5, subdivision (b)(6), this argument borders on specious—the transcript of the disposition hearing is replete with the findings of the abuse of K.H. and Am.H. As to the lack of benefit to the Minor of reunification services to Mother, the juvenile court clearly and specifically found: "To [Father] and [Mother], the court is going to indicate as follows and I'm going to make , again, specific findings . . . the court is going to find, by clear and convincing evidence in a moment, that reunification services would, in fact, be detrimental to the children." The court then clarified for counsel that this finding by clear and convincing evidence was as to Mother and Father, as parents of the Minor.

The parent in *In re S.G.* (2003) 112 Cal.App.4th 1254 made the same argument as Mother does here: "[S]he argues the court's failure to make specific findings was prejudicial because she has no meaningful method of obtaining appellate review. She claims it is impossible to ascertain whether the juvenile court found severe sexual abuse, severe physical harm or neither; determined appellant inflicted the harm or consented to it; or found it would not benefit the child to pursue services." (*Id.* at p. 1261.) The appellate court "strongly disagree[d]" with the parent's "disingenuous contentions." (*Ibid.*) There, as here, the parent conceded the severe physical harm allegation; the juvenile court could have found either that the parent personally inflicted the harm on the child and consented to the harm by her partner; and "given that the evidentiary and argument phases of the dispositional hearing focused almost exclusively

25

on whether it would benefit the child to pursue reunification services with her mother, we have no doubt that the court found there was no such benefit." (*Ibid.*)

*In re T.R.* (2023) 87 Cal.App.5th 1140, on which Mother relies, can be distinguished from the present case. In that case, in denying reunification services, the juvenile court said it was adopting the proposed findings in the child welfare services department's report without stating which bypass provision applied, identifying any specific instances of severe physical harm, or addressing whether the children would benefit from reunification services. (*Id.* at p. 1149.) The appellate court held that findings as to reunification services should generally not be implied "'from an otherwise silent record.'" (*Id.* at p. 1150.) More importantly, the appellate court held that in that case, there was not enough evidence in the record to make such inferences. (*Ibid.*) By contrast, while the juvenile court in this case may not have recited its findings into the record strictly following section 361.5, subdivision (k), the record was anything but silent as to the basis for the findings of severe physical harm and the lack of benefit to the Minor from reunification services.

Mother also cites *In re Albert T.* (2006) 144 Cal.App.4th 207, 219, which questioned whether an appellate court should imply findings from a silent record to support denial of reunification services. In that case, the appellate court concluded there was no evidence to satisfy the department's burden to prove the parent had failed to make reasonable efforts to address the problem leading to the removal of another child with whom the parent failed to reunify. (*Id.* at p. 221; see § 361.5, subd. (b)(10).) As with *In re T.R., supra*, 87 Cal.App.5th 1140, *In re Albert T., supra*, 144 Cal.App.4th 207 is distinguishable from the present case based on the full detailed record in the juvenile court regarding both the severe physical abuse suffered by K.H. and Am.H. and the reasons why reunification would not be in the Minor's best interest.

The juvenile court did not err by bypassing reunification services for Mother based on section 361.5, subdivision (b)(6)(A).

II. *Denial of Relative Placement*

Mother also challenges the juvenile court's denial of placement of the Minor with S.C.[5]

"'The best interest of the child is the fundamental goal of the juvenile dependency system, underlying . . . child safety, family preservation, and timely permanency and stability.' [Citation.] ""'Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.'"' [Citation.] Stability and continuity of care are primary considerations in determining the child's best interest. [Citation.] Custody determinations in dependency proceedings are 'committed to the sound discretion of the juvenile court,' and such rulings 'should not be disturbed on appeal unless an abuse of discretion is clearly established.' [Citation.] We will not disturb a custody determination ""'unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.'"' [Citation.]" (*In re J.M.* (2020) 44 Cal.App.5th 707, 718.)

"Section 361.3 gives 'preferential consideration' to placement requests by certain relatives upon the child's removal from the parents' physical custody at the dispositional hearing." (*In re N.V., supra*, 189 Cal.App.4th at p. 30.) The application of the relative placement preference "require[s] the consideration of multiple factors all dependent on an examination of evidence relating to the minor's current circumstances. Consequently, a reflexive approach that children are always better off with relatives is incompatible with the governing laws . . . ." (*Amber G. v. Superior Court* (2022) 86 Cal.App.5th 465, 489.)

"The overriding concern of dependency proceedings, however, is not the interest of extended family members but the interest of the child. '[R]egardless of the

---

[5]    Mother has standing to challenge the issue of denial of placement with the paternal aunt. (*In re N.V.* (2010) 189 Cal.App.4th 25, 27, fn. 1 [parent has standing to challenge order regarding placement of children with relative].)

relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected.' [Citation.] Section 361.3 does not create an evidentiary presumption that relative placement is in a child's best interests. [Citation.] The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests. [Citations.]" (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855.)[6]

Initially we note S.C. is not a "relative" of the Minor under section 361.3 and is not entitled to any of the presumptions under that statute.[7] S.C. is A.H.'s aunt, and thus the great-aunt of K.H. and Am.H. Nothing in the appellate record shows Mother and A.H. were ever married or in an official domestic partnership. Vis-à-vis the Minor, S.C. is at most a non-related extended family member.

If we were to nevertheless apply the factors to be considered under section 361.3, subdivision (a), we would agree with Mother that many support placement with

---

[6]    We note that the rather extreme passage of time in this case is not attributable to S.C. S.C. communicated with SSA early on in the child welfare proceedings to express her willingness to accept placement of the children. She continued to be involved with SSA and visited virtually and in person. The delays in reading the disposition hearing are not S.C.'s fault, but we cannot ignore them in considering the Minor's best interest.

[7]    "'Relative' means an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship, including stepparents, stepsiblings, and all relatives whose status is preceded by the words 'great,' 'great-great,' or 'grand,' or the spouse of any of these persons even if the marriage was terminated by death or dissolution." (§ 361.3, subd. (c)(2).) "'Affinity' means the connection existing between one spouse or domestic partner and the blood or adoptive relatives of the other spouse or domestic partner." (Cal. Rules of Court, rule 5.502(1).) "'Domestic partner' means one of two adults who have chosen to share one another's lives in an intimate and committed relationship of mutual caring as described in Family Code section 297." (*Id.*, rule 5.502(12).)

28

S.C. S.C. is undoubtedly of high moral character, can provide a safe, stable home for the Minor, and is capable of providing the specialized care required by the Minor's autism diagnosis. S.C. has also agreed to abide by any and all requirements set by the juvenile court or SSA.

However, the single most important consideration for any placement, including but not limited to a relative placement, is the best interest of the child. (See, e.g., § 361.3, subd. (a)(1); Fam. Code, § 7950, subd. (a)(1).) We cannot say the juvenile court erred in its determination that placement with S.C. would not be in the Minor's best interest. First, the relationship between S.C. and the Minor was not strong. S.C.'s interaction with K.H. and Am.H. occurred before Mother began her relationship with Father and before the Minor was born. S.C. admitted she had little contact with Mother and the children when Father was around, and nothing in the appellate record indicates S.C. had even met the Minor before their visit in California in July 2021. S.C. and the Minor had positive in-person visits in July 2021 and June 2022. But the Minor was not interested in virtual visits, which eventually stopped.

Second, and more importantly, the juvenile court's finding that the best interests of the Minor were served by remaining with the caregiver, with whom she has lived for the last three years—two-thirds of her young life—is supported by substantial evidence. "The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests." (*In re M.H.* (2018) 21 Cal.App.5th 1296, 1304.)

The juvenile court did not err by denying S.C.'s motion for relative placement under section 361.3.

29

DISPOSITION

The petition for writ of mandate/prohibition is denied.


                                    O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


DELANEY, J.